Willie Arthur THIGPEN,
Petitioner-Appellant,

v.

Duane CORY, Respondent-Appellee.

No. 85–1641.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 15, 1986.
Decided Oct. 27, 1986.
Rehearing and Rehearing En Banc
Denied Dec. 19, 1986.

David R. Rhein argued, Brown, Todd & Heyburn, Louisville, Ky., for petitioner-appellant.

Jan J. Raven argued, Detroit, Mich., for respondent-appellee.

Before JONES and NELSON, Circuit Judges; and CELEBREZZE, Senior Circuit Judge.

NATHANIEL R. JONES, Circuit Judge.

At a jury trial in the state court, petitioner, Willie Arthur Thigpen, was found guilty of armed robbery and possession of a firearm during the commission of a felony. After exhausting his rights of direct appeal, he sought a writ of habeas corpus in the district court. He argued that he was denied constitutional due process by the admission of the robbery victim's in-court identification of him. He also argued that a number of state law errors made by the

trial court deprived him of a fundamentally fair trial. The district court denied the writ, and petitioner now appeals.

The robbery victim and sole eyewitness, Robert Jackson, was working alone inside a gasoline station at 2:00 a.m. on February 7, 1981, when he saw two men approaching from the left side of the gas station, which was unlit and dark. The man in front, later identified as Jeffrey Thigpen, was holding a battery. From inside the station Jackson told the men that he would not charge the battery. Jeffrey then asked Jackson through a crack in the door if he would buy it. When Jackson hesitated, Jeffrey walked past Jackson into the station and placed the battery on the floor.

Jackson now was facing Jeffrey inside the station, and the second man was behind Jackson just inside the door. Jeffrey asked Jackson to "fire it up," referring to the battery. Before Jackson could reply, however, the second man put a gun to the back of Jackson's head and told him to "give it up." Only then did Jackson realize that the men intended to rob him. When Jackson started to speak, the second man told him to "shut up." At that point Jackson briefly turned to look at the man behind him, but testified that "most of the time" he looked at Jeffrey.

Next, Jeffrey searched Jackson for money while the second man remained "on [Jackson's] back," where Jackson "didn't pay too much attention" to him. After taking the money Jackson had in his pockets, Jeffrey insisted that there was more money in the station. Jackson acknowledged that there was, and led the two robbers to a "sort of dark" back room where he had hidden some money. Both robbers were behind Jackson as he walked to the back room.

From this point on, Jackson testified that he "really wouldn't be paying attention" to the two men's actions. The second man told Jackson to get under a desk, and a little later Jackson realized they had left. Jackson testified that his total contact with the two men lasted from one to five minutes. Of that time, he testified that he looked at the second man "not too much." He got a "real good look at Jeffrey," but "not a good look at" the second man.

Police officers arrived at the station approximately five minutes after the robbery. Jackson described the robbers as two black males, approximately six feet tall, with medium complexions. He indicated that one of the robbers was wearing a short, brown jacket, but otherwise could not remember any identifying details about the robbers, including their clothing, weight, hairstyle, or facial hair.

The police officers followed two sets of footprints in the snow, which led from the service station to a house several blocks away. While outside the house, the officers heard voices arguing inside. Willie Thigpen, the petitioner in this case, admitted the police officers into the house and allowed them to search the premises. Upon searching the house, the officers found two handguns as well as a canister of pennies resembling the one taken from the service station during the robbery. They also found Willie Thigpen's brother, Jeffrey, hiding in the basement of the house with a sheet over himself. They arrested both Jeffrey and Willie.

Willie Thigpen's version of these facts at trial was that he had been home that night since around 9 p.m., and that he had been eating pizza and playing with his cat when his brothers Jeffrey and Oakland came in. He said they offered him a canister of pennies, which he refused. When Oakland saw the police outside, both Oakland and Jeffrey ran to the back of the house. Willie contended that Oakland had hidden upstairs where he was not found because there were no lights. (Oakland, confessing to the robbery after Willie's conviction, corroborated Willie's version of the facts.)

Willie and Jeffrey Thigpen appeared in a line-up approximately nine hours after the robbery. Including the two brothers, there were only five men in the line-up. Jackson immediately identified Jeffrey Thigpen but did not say anything about anyone else in the line-up. The policeman conducting the line-up testified that he would have pre-

vented anyone in the line-up from "making faces" if he had noticed it, and that no "face-making" was brought to his attention. After Willie was not identified, the police released him.

Twelve days after the robbery, Jackson saw Willie Thigpen at Jeffrey's preliminary examination. When asked at Willie's trial what made him notice Willie at Jeffrey's preliminary examination, Jackson stated: "Like I said, I seen him when he was in the line-up when they sit and look like the same people, they looked different." But Jackson told no one, except allegedly his girlfriend, that he recognized Willie at this point.

Approximately two months after this, Jackson testified at Jeffrey's trial. A policeman testified at Willie's trial that Willie sat with his brother Jeffrey in the courtroom. Jackson testified that Willie came in and sat down next to Jackson, and Jackson then recognized him. When asked what went through his mind at that time, Jackson testified "same thing, I seen him in the lineup. I seen him a few times, and I think that's the man that robbed me, yeah." During Jeffrey's trial, Jackson told an official that Willie was the second robber. Willie was subsequently arrested.

At Willie's trial the evidence against him consisted of the handguns and the can of pennies recovered during the police search, Jackson's testimony concerning the robbery and identification, and the testimony of police officers concerning the search, apprehension and identification of Willie and Jeffrey Thigpen. Based on that evidence, Willie was convicted.

A conviction based on identification testimony following pretrial identification violates the defendant's constitutional right to due process whenever the pretrial identification procedure is so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). Because "reliability is the linchpin" of this analysis, *Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), courts have used two steps to find the use of identification testimony unconstitutional. First, the court evaluates the undue suggestiveness of the preidentification encounters. If the encounters were unduly suggestive, the court evaluates the "totality of the circumstances" to determine whether there are nevertheless sufficient independent indicia of reliability. *See, e.g., id.; Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–83, 34 L.Ed.2d 401 (1972).

■ In arriving at the conclusion that the pre-identification encounters in this case were not unduly suggestive, both the state appellate court and the federal district court relied on the fact that police machinations did not cause the confrontations between the witness and the defendant. This was an erroneous basis for decision, for the deterrence of police misconduct is not the basic purpose for excluding identification evidence. *See Neil v. Biggers,* 409 U.S. at 198–99, 93 S.Ct. at 381–82; *Green v. Loggins,* 614 F.2d 219, 222 (9th Cir.1980). Because it "is the likelihood of misidentification that violates a defendant's right to due process," *Neil v. Biggers,* 409 U.S. at 198, 93 S.Ct. at 381–82, only the effects of, rather than the causes for, pre-identification encounters should be determinative of whether the confrontations were unduly suggestive. In other words, we adopt the Ninth Circuit's holding in *Green v. Loggins,* 614 F.2d 219 (9th Cir.1980) (Peck, J., sitting by designation), that,

> a court is obligated to review every pretrial encounter, accidental or otherwise, in order to insure that the circumstances of the particular encounter have not been so suggestive as to undermine the reliability of the witness' subsequent identification.

*Id.* at 223.

In the case at hand it is undisputed that the witness encountered the defendant three times prior to identifying him as the second robber: at the line-up, at Jeffrey's preliminary examination, and at Jeffrey's trial. Although only one of these confrontations was caused by the police, we consid-

er all three to determine whether unduly suggestive encounters occurred.

■ An individual's appearance in a line-up suggests to a witness that the person is in police custody for some reason. Even if the police do not indicate that the people to be viewed are all suspects for that particular crime, seeing a man in a small line-up for a crime is likely to associate that person with the crime to some degree in the witness' mind. Indeed, in the case at hand, every time Jackson was asked about his thoughts when he later encountered Willie, Jackson testified that his immediate thought was that he had seen Willie in the line-up for the robbery. The suspicion planted in Jackson's mind by Willie's presence in the line-up was significantly reinforced by seeing Willie at two court proceedings involving the man Jackson had identified at the line-up as the first robber. Federal courts have previously held that circumstances such as these are unduly suggestive, *United States v. Ballard,* 534 F.Supp. 749, 752 (M.D.Ala.1982) (defendant seen at line-up and a series of related court proceedings); *United States ex rel. Johnson v. Hatrak,* 417 F.Supp. 316, 327 (D.N.J. 1976) (defendant seen at line-ups and unrelated preliminary hearing), *aff'd mem.,* 564 F.2d 90 (3rd Cir.1977), *cert. denied,* 435 U.S. 906, 98 S.Ct. 1454, 55 L.Ed.2d 497 (1978), and we agree. Jackson's repeated encounters with Willie Thigpen in connection with the investigation and trial for the robbery were unduly suggestive.

Having found that unduly suggestive encounters occurred in this case, we must next determine the "central question"— whether under the totality of the circumstances the identification was nevertheless reliable. *Neil v. Biggers,* 409 U.S. at 199, 93 S.Ct. at 382. The Supreme Court has set out the factors to be considered:

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confronta-

tion, and the length of time between the crime and the confrontation.

*Id.* at 199–200, 93 S.Ct. at 382–83. Although we must afford a presumption of correctness to the state court's factual findings concerning these factors, whether the factors demonstrate reliability in the identification process is a question of law for this court to decide. *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) (per curiam).

At the pretrial hearing to determine whether the witness' identification testimony was admissible, pursuant to *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the trial court made factual findings concerning several of the factors. With respect to the first factor— the opportunity of the witness to view the criminal at the time of the crime—the state court correctly held that Jackson had viewed the robbers at close range inside the gas station under fluorescent lighting. The court also held that the witness observed the second robber for approximately five minutes. However, the court based this finding on its cursory, leading examination of Jackson:

> THE COURT: How long did the incident take place at the gas station approximately?
>
> THE WITNESS: About five minutes.
>
> THE COURT: So you had five minutes to observe Willie Thigpen for approximately 5 minutes; is that correct?
>
> THE WITNESS: Yeah.

*Wade* Hearing Transcript, # 14, at 63. The facts developed at trial demonstrate that Jackson actually observed the second robber infrequently during the five-minute robbery. Jackson testified that the second man was directly behind him most of the time, that he turned to look at him briefly only once, and that although the man was not behind him after they moved to the back office, the office was dark and the witness was under a desk. Consequently, the trial court's finding at the *Wade* hearing concerning the length of the observation is not entitled to a presumption of correctness, 28 U.S.C. § 2254(d)(3) (1982),

and we accept the witness' trial testimony that he barely looked at the second robber during the robbery.

With respect to the witness' degree of attention, the trial court held that the witness was not drunk or under the influence of drugs. But the court did not mention the degree of stress that the witness might have felt and how it might have affected his attention. This court has previously noted the important effects stress or excitement may have on the reliability of an identification. *United States v. Russell*, 532 F.2d 1063, 1066 (6th Cir.1976). Jackson was obviously affected by such stress, for at trial he repeatedly indicated that he was too scared during the robbery to "pay too much attention" to the robbers.

The trial court did not explicitly make any findings concerning the third factor— the accuracy of the prior description of the criminal. Although Jackson could not remember how he had described the robbers, the policeman who made out the report testified that his entire description was of "two black males, approximately six feet ... one was wearing a short brown jacket ... medium complexion." While Willie is indeed a black male approximately six feet tall, that description fits many people. Accuracy also refers to how *particularly* a description matches a suspect, and Jackson was unable even to describe the robbers' weights, builds, hairstyles, or facial hair.

Concerning the fourth factor—level of certainty—the trial court noted in its conclusions at the *Wade* hearing that Jackson did not identify Willie at the line-up because he "wanted to be sure of his identification." Thus, the witness' level of certainty on the day of the robbery was clearly low. It also seems to have been low at the first in-court confrontation since the witness continued to remain silent. Even later, at Willie's trial, during both direct and cross-examination the witness stated only that he was "pretty sure" that Willie was the robber. The state court's findings do not contradict this.

Finally, the time between the crime and the confrontation is undisputed. The confrontation which rendered Jackson "pretty sure" that Willie was the robber occurred over two months after the robbery.

■ Altogether, none of the five factors indicates that Jackson's identification of Willie was reliable, and so the suggestive preidentification confrontations between Jackson and petitioner did indeed create a substantial likelihood of irreparable misidentification. We therefore hold that the trial court violated petitioner's due process rights by admitting Jackson's testimony identifying Willie as the second robber.

The next question is whether the admission of the identification testimony was harmless error. The Supreme Court in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), adopted the approach to harmless error that it had previously developed in *Fahy v. Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963): " '[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " *Chapman*, 386 U.S. at 23, 87 S.Ct. at 827 (quoting *Fahy*, 375 U.S. at 86–87, 84 S.Ct. at 230–31). In the course of its analysis the Court criticized the California courts for their overemphasis of the other substantial evidence of a defendant's guilt. *Id.* Furthermore, the Court concluded that the beneficiary of the error has the burden of proving that the error was harmless beyond a reasonable doubt. *Id.* at 24, 87 S.Ct. at 828.

■ In this case the state could not possibly prove beyond a reasonable doubt that the identification testimony did not influence petitioner's conviction. The state itself, at the evidentiary hearing on the defendant's motion for a new trial, characterized Jackson's identification of petitioner as "the first and probably the most important" evidence. At this same hearing the court intimated that it was the identification testimony that rendered unlikely a different outcome in a new trial. Although there was other evidence against petitioner—for instance, the handguns and some money from the robbery were in the house

where he was found, and two sets of tracks led to that house from the gas station—those facts were consistent with his alibi. There was not the sort of substantial evidence linking defendant to the crime that would support a finding that the identification was harmless error. *See, e.g., United States v. Russell,* 532 F.2d 1063, 1068 (6th Cir.1976) (identifications which violated due process not harmless in view of "dearth of other evidence"); *Cf. United States ex rel. Johnson v. Hatrak,* 417 F.Supp. 316, 327–28 (D.N.J.1976) (identifications harmless when five other eyewitnesses testified).

Because we hold that petitioner was deprived of due process by the admission of the identification testimony, we need not address the issue of whether he was denied a fundamentally fair trial by the state court's evidentiary errors. We do hold, however, that he adequately presented that constitutional claim in the state courts, and so met the exhaustion requirement. *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

Accordingly, we REVERSE the judgment of the district court denying the petition for a writ of habeas corpus, and REMAND the cause to the district court with instructions to grant the writ.

DAVID A. NELSON, Circuit Judge, dissenting.

This is the kind of case that makes an appellate judge yearn for a seat in the jury box. Where a witness (particularly an unsophisticated witness) has testified on a close point, the printed record—which cannot capture the witness's gestures, or bearing, or the emphasis and inflection with which he answers key questions, and cannot enable the reader to gauge, as a jury can, the witness's sincerity, candor and intelligence—has obvious limitations as a guide to the truth. I do not know how I would have voted as a juror in this case, not having heard the testimony, but it is by no means inconceivable that I might have voted for acquittal. It is also possible that if, as an appellate judge, I had heard the appeal from the conviction, I would have

favored reversal—for I have some concern about the adequacy of the trial court's jury instructions. The case is not here on appeal of the conviction, however, nor are we sitting as finders of fact to decide whether Willie Thigpen was guilty beyond a reasonable doubt. Our function is much narrower: to decide, as a matter of federal constitutional law, whether the State of Michigan sent Willie Thigpen to jail without having accorded him due process of law. I do not believe it did, and must therefore dissent.

In analyzing the process by which Mr. Thigpen was convicted, it is helpful to bear in mind, I think, that the process *qua* process was highly protective of the defendant's interests. Mr. Thigpen could not afford a lawyer, so the State of Michigan provided him one at its own expense. The lawyer was informed, prior to trial, of the identification testimony to be presented by the robbery victim, and was permitted to question the victim at great length in a pre-trial hearing held to assist the trial judge in making an informed decision on whether the testimony was sufficiently reliable to warrant letting the jury hear and evaluate it for itself. Counsel was then permitted to participate actively in the selection of the jury from a panel that had first been carefully instructed on the presumption of the defendant's innocence, on the state's burden of proof, and on the concept of reasonable doubt. Those instructions were repeated once the jury had been chosen, sworn, and seated. Under direct examination by the prosecutor and under cross-examination by Mr. Thigpen's own counsel, the victim gave to the jury the full background of his identification of Mr. Thigpen, including facts tending to cast doubt on its reliability. Mr. Thigpen was permitted, but not required, to give the jury his own version of the facts. At the conclusion of all the testimony, counsel were allowed to address the jury directly and offer arguments on what the evidence did or did not prove. The trial judge then instructed the jury on the applicable law, advising the jury yet again on the presumption of innocence, reasonable doubt, and the state's burden of proof. Only upon the

unanimous vote of twelve jurors who had sworn to render a true verdict on all the evidence did the state allow Mr. Thigpen to be convicted. The judgment rendered on the jury's verdict was appealed—still at state expense—to a three judge appellate court which sent the case back to the trial judge for an evidentiary hearing on Mr. Thigpen's motion for a new trial. After that, with the full record of the trial and the pre-trial and post-trial hearings before it, the appellate court—sworn, as we are, to uphold the United States Constitution—affirmed the conviction in a carefully reasoned opinion evidencing full awareness of the question about the reliability of the identification. Mr. Thigpen's counsel was then allowed to present the record to the Supreme Court of Michigan and seek leave for another appeal. Although the Supreme Court, having considered the record, was not persuaded that such relief should be granted, the defendant in a criminal case has no constitutional right to multiple appeals,[1] and there can be absolutely no doubt that the "process" followed by the State of Michigan was eminently fair to Mr. Thigpen.

Where, as here, the state has provided an opportunity for full and fair litigation of a claim that evidence resulting from allegedly defective identification procedures should be withheld from the jury, I think it is an open question whether a federal habeas court ought even to consider the possibility of setting aside the state's resolution of that claim. In *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), where the evidence in question was claimed to have been obtained in violation of the Fourth Amendment's explicit prohibition against unreasonable searches and seizures, the Supreme Court held that as long as the state has permitted full and fair litigation of the Fourth Amendment claim, the results of the litigation may not be reexamined by the federal courts and "a state prisoner may not be granted federal habeas relief on the ground that evidence

obtained in an unconstitutional search or seizure was introduced at his trial." In the case at bar the evidence in question is not even arguably unconstitutional under the text of any provision of the Bill of Rights—to exclude that evidence, on the contrary, would be to diminish the historic function of the "impartial jury" contemplated under the Sixth Amendment—and at least insofar as the exclusionary rules for allegedly defective identification evidence are based on the kinds of considerations applicable in the Fourth Amendment area, the logic of *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, *supra*, would preclude us from any reexamination of the determination that Mr. Jackson's identification testimony was sufficiently reliable to be submitted to the jury.

Be that as it may, the facts brought out at the pre-trial hearing on the reliability of the identification seem to me to provide more than adequate support for the trial court's decision to let the jury analyze the evidence for itself. Mr. Jackson, the victim of the robbery, explained that his gas station booth—which had "windows all the way around it"—was illuminated by fluorescent lighting. The two men who robbed him approached the station from a side that did not have exterior lighting, but Mr. Jackson could see them coming, and the area in the immediate vicinity of the station was "lit up pretty bright." Although he did not have to unlock his door for them, Mr. Jackson did in fact unlock it, open it a crack, and speak to the men—face-to-face, presumably—through the opening. He told them he would not charge the car battery one of them was carrying, and he was told in reply that they did not want the battery charged but wanted to sell it to him. One of the men then walked past Mr. Jackson and set the battery down. Only for a minute did Mr. Jackson turn away from the doorway, where the second man remained standing, but before Mr. Jackson could turn back to face the second man again

---

1. For the first one hundred years after the federal constitution was adopted, indeed, "there was, in practical effect, *no* appellate review in *federal* criminal cases." *Stone v. Powell*, 428 U.S. 465, 475 n. 7, 96 S.Ct. 3037, 3043 n. 7, 49 L.Ed.2d 1067 (1976) (emphasis supplied).

that individual pointed a gun at the right side of Mr. Jackson's neck and told him to give up his money.

Mr. Jackson testified unequivocally that he remembered the defendant, Willie Thigpen, as the second man. When asked "are you sure that he's the other man that robbed you," Mr. Jackson answered, without qualification, "yeah."

Under questioning from the court, Mr. Jackson testified that he had been at work for three or four hours before the robbery, that he had not been drinking any alcoholic beverages ("I don't drink"), had not been taking any type of drugs ("I don't mess with no drugs"), and was not on any type of medication. Mr. Jackson could not remember what kind of clothing the man he identified as Willie Thigpen was wearing at the time of the robbery, but he did remember that Willie had a hat on—a circumstance that might have made it difficult to say anything about Willie's hairstyle.

Mr. Jackson testified that he saw both robbers in a police lineup held the next day, but only told police about one of them, Jeffrey Thigpen, Willie's brother. Mr. Jackson did not point out Willie, who was also in the lineup, because, he testified, "I wasn't sure. He was making faces and I wouldn't want to pick the wrong person, so that's why I didn't." The trial judge asked if Willie looked different in the lineup, and Mr. Jackson explained that "he didn't have no jacket and things on," and "[h]e kind of frowned."

Mr. Jackson attended Jeffrey Thigpen's preliminary examination, where he saw Willie in the spectator seats. Mr. Jackson did not point Willie out to the police at that juncture, but he did tell his girlfriend, who was with him, that Willie looked like one of the robbers. (The testimony that he told his girlfriend about Willie was repeated several times, both at the pre-trial hearing and before the jury; I know of no reason to question its accuracy.)

Mr. Jackson was also required to testify at Jeffrey's trial. A separation of witnesses had been ordered, but Mr. Jackson saw Willie in an outer corridor on the day after the trial; at that time he told the police that he recognized Willie Thigpen as the other person who had robbed him. When asked if he had identified Willie Thigpen "because you remembered him as being the robber," Mr. Jackson responded "because I remember—that's the only way I can say. I wouldn't want to point nobody out if it wasn't them." Mr. Jackson went on to deny that the only reason he had pointed Willie out was that he had seen him after the lineup. At no time in his testimony at the pre-trial hearing did Mr. Jackson ever indicate that the thought which came to his mind in the post-lineup encounters was that he had seen Willie in the lineup.

Having listened to the testimony that takes up more than fifty pages in the written transcript of the pre-trial hearing, and having heard the arguments of counsel, the trial judge placed on the record an extensive summary of the evidence as to whether there was a "sufficient factual basis to establish an independent identification." She then noted that Willie Thigpen had not been sitting at the defense counsel's table, where Mr. Jackson might have identified him "only because he was at the table," and she concluded that "this was a reliable identification...."

In its factual aspect, that determination must, by statute, be presumed correct; and although the constitutionality of the pre-trial identification procedure is not itself governed by the statute, "the questions of fact that underlie this ultimate conclusion *are* governed by the statutory presumption...." *Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 1307, 71 L.Ed.2d 480 (1982) (emphasis by the Court). Subject to certain exceptions not applicable here, and in the absence of a conclusion by the habeas court that "such factual determination is not fairly supported by the record [of the pre-trial hearing considered as a whole]," 28 U.S.C. § 2254(d) provides:

> "In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, *a determination after a hearing*

*on the merits of a factual issue,* made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, *shall be presumed to be correct....*" (emphasis supplied).[2]

Where this presumption of correctness applies, the statute provides that a habeas applicant may overcome it only through "convincing evidence" that the state court's factual determination was erroneous. (See *Sumner v. Mata,* 449 U.S. 539, 550, 101 S.Ct. 764, 770–71, 66 L.Ed.2d 722 (1981), where the Court, per Rehnquist, J., emphasized the words "convincing evidence.") Yet the record of this case shows that Willie Thigpen's own counsel, having just heard the same live testimony on which the trial court's factual determination was based, was aware of no evidence, "convincing" or otherwise, to suggest that Mr. Jackson had not had an opportunity to observe the faces of both robbers on the night in question. On the contrary, defense counsel told the jury, in opening statement, that:

> "The testimony is going to show that Mr. Jackson ... had a chance to look at both their faces for a considerable amount of time. That he had a chance to see both their faces, that he had a chance to view them during the robbery for a considerable length of time, as good as 5 or 10 minutes."

Defendant's own counsel having made this kind of concession as to the first (and possibly the most significant) of the four "factors" mentioned in *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972), it is hard for me to see how we could properly second-guess him. In any event, we may not second-guess the trial court, which also heard the live pre-trial testimony; the opportunity of the witness to view the criminal at the time of the

crime and the other *Neil v. Biggers* factors "are all questions of fact as to which the statutory presumption applies." *Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 1306–07, *supra.*

Although the testimony that Mr. Jackson gave before the jury did not go as far as defense counsel expected it to, it was generally consistent with that at the pre-trial hearing. Mr. Jackson again pointed to Willie Thigpen as one of the two men who had come to his service station about two o'clock in the morning of February 7, 1981. Both men came to the door together, he told the jury. Mr. Jackson spoke to them in the doorway, under a "pretty bright" fluorescent light, before he let them in and before they pulled their guns on him. He did not testify that he was under stress at this point, and the jury could reasonably have inferred he was not under stress because he voluntarily unlocked his door. Willie Thigpen remained with Mr. Jackson at the well-lit doorway while Jeffrey carried the car battery inside; until Willie pulled his gun, Mr. Jackson had not realized he was being robbed. Thereafter Mr. Jackson's attention was mainly focused on Jeffrey, but he did look at Willie again when Willie, still holding him at gunpoint, told him to "shut up." After the robbers had taken Mr. Jackson into the station manager's office (where the light—which was not as bright as the fluorescent lighting—did not have to be turned on because it "probably was already on"), Mr. Jackson could not say that he got a "good" look at Willie, but he did testify "I turned around and I could see him." The total amount of time that elapsed between Mr. Jackson's first sight of the two men and the last time he saw them could not have been as little as one minute—"it was longer than one"— and it "could have been" less than ten minutes, and more likely five minutes.

Mr. Jackson went on to explain to the jury the circumstances under which he fi-

**2.** The enactment of this statute "reflected the sentiment, shared alike by judges and legislators, that the writ [of habeas corpus] has overrun its historical banks to inundate the dockets of federal courts and denigrate the role of state courts." *Schneckloth v. Bustamonte,* 412 U.S. 218, 273, 93 S.Ct. 2041, 2071, 36 L.Ed.2d 854 (1973) (Powell, J., concurring.)

nally volunteered to the police that Willie Thigpen was the second robber, and defense counsel, on cross-examination, invited Mr. Jackson to agree that he had simply concluded Willie "might be the guy." The response—delivered with an inflection and emphasis known to the trial judge and jury, if not to us—was: "it ain't no *might* be the guy." (Emphasis surmised.)

Mr. Jackson's eyewitness identification of Willie Thigpen as one of the robbers was corroborated by circumstantial evidence that the jury could have found highly persuasive. The two sets of footprints going away from the gas station in the snow led the police to a house in which they found both Willie and Jeffrey. There were no footprints going away from the house, and in searching the premises the police did not find the third man Willie claimed—much later—had also been in the house. The police did, however, find loot from the robbery and two handguns. The Michigan Court of Appeals, in holding that the trial court's denial of the motion for a new trial did not constitute an abuse of discretion, characterized the evidence against Willie Thigpen as "overwhelming."

On that kind of record, it is fair to say that only within the last two decades have the decisions of the United States Supreme Court provided much of any basis for even arguing that the State of Michigan must grant Mr. Thigpen a new trial or set him free. The line of authority on which any such argument must be predicated begins with a trilogy of cases decided on June 12, 1967—*United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 and *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199—where the Court fashioned new exclusionary rules "to deter law enforcement authorities from exhibiting an accused to witnesses before trial for identification purposes without notice to and in the absence of counsel." *Stovall, supra*, 388 U.S. at 297, 87 S.Ct. at 1970. Speaking through Justice Brennan, the Court noted that the new standards—which required trial courts to conduct precisely the kind of preliminary hearing held in the case at bar to determine whether the witness had an *independent* basis for identifying the accused—"were not foreshadowed in our cases; no court announced such a requirement until Wade was decided by the Court of Appeals for the Fifth Circuit, 358 F.2d 557. *The overwhelming majority of American courts have always treated the evidence question not as one of admissibility but as one of credibility for the jury.*" *Stovall, supra*, 388 U.S. at 299–300, 87 S.Ct. at 1971–72 (emphasis supplied).

The limits of the new doctrine are still being charted, and the degree of enthusiasm on the Supreme Court for cutting back the historic fact-finding functions of the jury has been far from uniform. See, for example, the dissent of Justice Black in *Foster v. California*, 394 U.S. 440, 447, 89 S.Ct. 1127, 1131, 22 L.Ed.2d 402 (1969):

> "One of the proudest achievements of this country's Founders was that they had eternally guaranteed a trial by jury in criminal cases, at least until the Constitution they wrote had been amended in the manner they prescribed.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Of course it is an incontestable fact in our judicial history that the jury is the sole tribunal to weigh and determine facts. That means that *the jury must, if we keep faith with the Constitution, be allowed to hear eye-witnesses and decide for itself whether it can recognize the truth and whether they are telling the truth. It means that the jury must be allowed to decide for itself whether the darkness of the night, the weakness of a witness' eyesight, or any other factor impaired the witness' ability to make an accurate identification.* To take that power from the jury is to rob it of the responsibility to perform the precise functions the Founders most wanted it to perform." (Emphasis supplied).

Justice Black's eloquent dissent in *Foster* has not been explicitly embraced by the Supreme Court in the years since 1969, but neither, one suspects, has it been ignored.

As the Court pointed out in *Neil v. Biggers*, 409 U.S. 188, 197, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972), *Foster* is "[t]he only case to date in which this Court has found identification procedures to be violative of due process...." That situation, I believe, remains unchanged as of 1986; as far as I know, *Foster* is still the only case in which the Supreme Court has found identification procedures violative of due process.

Preeminent among the several cases in which the Supreme Court has *declined* to find identification procedures violative of due process is *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). There the Supreme Court reversed a decision in which the Court of Appeals for the Second Circuit had granted habeas relief to a prisoner convicted in a state trial on the testimony of a witness to whom the police had shown the suspect's photograph, all by itself, without utilizing either a photographic array or lineup. As is not true in the case at bar, the eyewitness identification constituted the "sole evidence" tying the defendant to the crime. Impermissibly suggestive as the use of a single photograph may have been, the Supreme Court elected to follow a "lenient" approach to the admissibility of identification testimony found to possess "certain features of reliability." 432 U.S. at 110, 97 S.Ct. at 2251. Absent circumstances demonstrating "a very substantial likelihood of irreparable misidentification" (the test used in *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)), the *Manson* court held, in language evocative of Justice Black's *Foster* dissent, that identification evidence

> "... *is for the jury to weigh*. We are content to rely upon the good sense and judgment of American juries, for *evidence with some element of untrustworthiness is customary grist for the jury mill*. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." 432 U.S. at 116, 97 S.Ct. at 2254 (emphasis supplied).

Among the circumstances held in *Manson* to have militated in favor of the finding of no constitutional violation was the fact that there had been "little pressure on the witness to acquiesce in the suggestion that [a single photograph] display entails." 432 U.S. at 116, 97 S.Ct. at 2254. Since the witnesses examined the photograph outside the presence of the police, moreover, "there was no coercive pressure to make an identification arising from the presence of another. The identification was made in circumstances allowing care and reflection." *Id.*

In this respect, ours is an even stronger case. Here there was not merely "little pressure" on Mr. Jackson to identify Willie Thigpen as the second robber, there was no pressure at all. Moreover, Mr. Jackson's identification of Willie Thigpen was made in circumstances allowing the utmost "care and reflection;" if Mr. Jackson had allowed himself a little less care and reflection, indeed, I might not be writing in dissent.

*Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, *supra*, which provided the test applied in *Manson*, also involved the allegedly improper use of photographs by the police. Explicitly recognizing that photographs "may sometimes cause witnesses to err in identifying criminals," noting that "[a] witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions," and pointing out that "there is some danger that the witness may make an incorrect identification" even if the police "follow the most correct photographic identification procedures," the Supreme Court nevertheless refused to prohibit the pre-trial use of photographic identification procedures. In a passage foreshadowing both Justice Black's dissent in *Foster*, 394 U.S. 440, 89 S.Ct. 1127, *supra*, and Justice Blackmun's majority opinion in *Manson*, 432 U.S. 98, 97 S.Ct. 2243, *supra*, the Court pointed out that "[t]he danger that use of the technique may result in convictions based on misidentification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the meth-

od's potential for error." 390 U.S. at 383–84, 88 S.Ct. at 970–71.

In a concurring opinion quoted with approval both in *Manson*, 432 U.S. at 113 n. 14, 97 S.Ct. at 2252–53 n. 14, and in *Watkins v. Sowders*, 449 U.S. 341, 348, 101 S.Ct. 654, 658–59, 66 L.Ed.2d 549 (1981), Judge Harold Leventhal amplified this point: "[c]ounsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification—including reference to both any suggestibility in the identification procedure and any countervailing testimony such as alibi." *Clemons v. United States*, 408 F.2d 1230, 1251 (D.C.Cir.1968), *cert. denied*, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969). And as Justice Stewart noted, speaking for the court in *Watkins, supra:* "the proper evaluation of evidence under the instructions of the trial judge is the very task our system must assume juries can perform." 449 U.S. at 347, 101 S.Ct. at 658.

A good example of the situation, mentioned in *Simmons*, where a "witness may have obtained only a brief glimpse of a criminal, or may have seen him under poor conditions," is presented in *Coleman v. Alabama*, 399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970). There the Court refused to disallow an in-court identification claimed to have been the fruit of impermissibly suggestive lineup procedures, notwithstanding that the witness—who had been shot by two men while changing a flat tire by the side of the road at night—had only a fleeting look at his assailants in the headlights of a passing car and had been unable to describe them to the police other than by saying vaguely that they were "young, black males, close to the same age and height." The men subsequently identified at the lineup were both black, but they were ten years apart in age (18 versus 28) and almost ten inches apart in height (6′2″ versus 5′4½″). Speaking through Justice Brennan, the court declared that the trial court "could find on the evidence adduced at the suppression hearing that [the witness's] identifications were entirely based upon observations at the time of the assault and not at all induced by the conduct of the lineup." 399 U.S. at 5–6, 90 S.Ct. at 2001–02. The implications of that decision for the instant case are obvious.

Still another Supreme Court decision declining to find identification procedures violative of due process is *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, *supra*. There the defendant in a state court trial for rape had been identified by the victim in an impermissibly suggestive "show up" conducted many months after the attack. (The show up consisted of two detectives walking the sole suspect past the victim and having him say, at her request, "shut up or I'll kill you.") The victim in *Neil v. Biggers*, while standing in the doorway of her unlit kitchen, had been grabbed from behind by a knife-wielding youth and grappled to the floor. There was no light in the kitchen, but the victim testified that she had been able to see her assailant's face in "light from the bedroom shining through." She also testified that she had been able to see him as he walked her, at knife point, to the woods where she was raped—a walk of about two blocks in the moonlight. The only description the victim had been able to give the police was "very general," according to a federal district judge who subsequently granted a petition for habeas corpus, but the Supreme Court, in holding that the identification evidence was properly allowed to go to the jury, found the description "more than ordinarily thorough," even if it "might not have satisfied Proust." 409 U.S. at 200, 93 S.Ct. at 383.

It is far from obvious that the victim in *Neil v. Biggers* had a better opportunity to view her assailant than Mr. Jackson had to view his. The degree of stress to which the rape victim was subjected, moreover, obviously exceeded Mr. Jackson's; when Mr. Jackson first talked with his assailants in the brightly lit doorway of his gas station, indeed, he was under no stress at all. The degree of certainty registered by the rape victim (an articulate nurse) was greater than Mr. Jackson's, but the lapse of time between the assault and the identification was also greater—seven months there and

about one-third that time here. The Supreme Court having reversed the grant of habeas corpus in *Neil v. Biggers* in the belief that the reliability of the identification could properly be left for the jury, I am not persuaded that the trial court violated the federal constitution by allowing the jury to hear Mr. Jackson's identification testimony here.

The Supreme Court decision that I believe comes closest to supporting the conclusion that Willie Thigpen should be granted habeas relief in the case at bar is *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, *supra.* Although that was not a habeas corpus case, and the Court thus did not have to be concerned, as we must here, about "the limited nature of the review provided federal courts by [the habeas corpus statute]" (*Sumner v. Mata*, 449 U.S. 539, 541, 101 S.Ct. 764, 766, 66 L.Ed.2d 722 *supra* ), the underlying facts do resemble ours in several respects. The crime in *Foster* was the late-night robbery of a telegraph office. The manager of the office, who was the only witness, could not make a positive identification of the defendant in a lineup, notwithstanding that there were only two other men in the lineup—both six or seven inches shorter than he—and the plaintiff was wearing a leather jacket similar to that worn by the robber. In a one-to-one confrontation held in a police station office after the lineup, with no one else present except prosecuting officials, the witness still could not make a positive identification of the plaintiff. Some days later the police arranged another lineup, in which the defendant was the only person who had appeared in the earlier lineup; only then did the witness prove able to make a positive identification. Without commenting on the opportunity of the witness to view the criminal at the time of the crime, or the witness's degree of attention at the time of that crime, or the accuracy of the witness's prior description of the criminal, the Supreme Court reversed the conviction because, as the court held, the identification procedures had been so unnecessarily suggestive and conducive to irreparable mistake as to be constitution-

ally impermissible. Speaking through Justice Fortas, the Court said:

> "The suggestive elements in this identification procedure made it all but inevitable that [the witness] would identify [the defendant] whether or not he was in fact 'the man.' In effect, the police repeatedly said to the witness, *'This* is the man.' "

\*    \*    \*    \*    \*    \*

> "In the present case the pretrial confrontations clearly were so arranged as to make the resulting identifications virtually inevitable." 394 U.S. at 443, 89 S.Ct. at 1129 (emphasis by the Court).

Although it found there had been a denial of due process, the *Foster* Court did not, it is interesting to note, go on to decide whether the error could be found "harmless" under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The Court remanded the case to the state courts for decision of that question—a procedure applauded by Justice Black, who thought "this issue can usually be tried more efficiently, and just as fairly, by the local court that tried the case or by the local appellate court that heard the first appeal." 394 U.S. at 452, 89 S.Ct. at 1133.

In the case at bar, in contrast to *Foster*, the police did absolutely nothing to suggest to Mr. Jackson that "Willie Thigpen is the man." This was Mr. Jackson's suggestion, not that of the police, and by no stretch of the imagination can the identification in this case be said to have been made "all but inevitable" or "virtually inevitable" by anything the police said or did. Mr. Jackson's identification of Willie Thigpen was corroborated, moreover, by independent, objective evidence of a kind not present in *Foster*.

If Mr. Jackson's accidental encounters with Willie Thigpen after the lineup were not nearly so suggestive as the planned encounters arranged by the police in *Foster*, neither were they so suggestive as that described in Judge Peck's opinion in *Green v. Loggins*, 614 F.2d 219 (9th Cir.1980). *Green* did involve an accidental encounter

(which happened to be the result of negligence on the part of the state), but its setting—a jail cell—"strongly suggested" that the person identified at the conclusion of the encounter had been accused of a crime. 614 F.2d at 223. The jail cell, as Judge Peck noted, "clearly labeled [him] as a criminal defendant;" an encounter in a courthouse corridor (*cf. United States v. Massaro*, 544 F.2d 547 (1st Cir.1976), *cert. denied*, 429 U.S. 1052, 97 S.Ct. 766, 50 L.Ed.2d 769 (1977)) would not have done so. *Id.* at 222–23. Willie Thigpen, unlike the suspect in *Green*, was not a criminal defendant, and he had not been labeled as such, "clearly" or otherwise. He was not being held in a jail cell, and, as the trial court noted, he was not even sitting at defense counsel's table during his brother's preliminary hearing. The final (and crucial) encounter occurred in a courtroom corridor, as in *Massaro*, and Willie was obviously not in custody. In *Green*, moreover, the man in the cell was identified "specifically as the state's suspect" when the police called him by name. 614 F.2d at 223. Nothing comparable occurred in the case at bar.

A case more pertinent here than *Green*, in my view, is *United States v. O'Neal*, 496 F.2d 368 (6th Cir.1974). In *O'Neal*—which reached this court by direct appeal, significantly, and not through the habeas corpus route—this court affirmed the conviction of two men who were accused of having robbed a bank while masquerading as Brink's messengers. There were no fewer than eight witnesses to the robbery; none of them had been able to identify Mr. O'Neal in the first instance. Among the facts casting doubt on the reliability of the identification evidence on which Mr. O'Neal was ultimately convicted were these:

"1) That eight witnesses saw the two bogus Brinks men;

2) None of the eight identified appellant's picture when they were shown it by the FBI;

3) At the first line-up none of the eight identified appellant, although he was in the line-up;

4) Three of them identified another party, one Eli Felder, while two other witnesses identified still other parties; and

5) The only two witnesses who did identify appellant as one of the bogus Brinks men had previously misidentified another party." 496 F.2d at 371.

Commenting on the misidentifications made by the two bank tellers who later identified Mr. O'Neal as one of the robbers, this court said:

"... the jury was entitled to and did have all the relevant evidence as to identification and misidentification. The initial misidentification on the part of these eye-witnesses to a crime did not completely destroy the value of their testimony or render it inadmissible. The jury was fully advised of the original mistake and had it as well as the subsequent testimony identifying appellant before them to weigh. The weight to be given this evidence was for the jury to determine." 496 F.2d 372 (Citations omitted).

At the end of its opinion in *O'Neal*, this court noted that the trial court had "cautioned the jury about the dangers of misidentification and instructed the jury about how to weigh that evidence." 496 F.2d at 373. Had I been reviewing Mr. Thigpen's conviction on direct appeal, I would have been concerned over the failure of the trial court to do that here. As *O'Neal* points out, however, the defendant "has a duty to assist the court in providing appropriate requested instruction...." 496 F.2d at 373. No exception was taken to the jury instruction in the case at bar, no instruction on misidentification was requested, and I see in the instructions no plain error, of constitutional magnitude, that would require us to vacate the conviction on collateral attack.

I turn finally to this court's recent decision in *Smith v. Perini*, 723 F.2d 478 (6th Cir.1983), *cert. denied*, 466 U.S. 941, 104 S.Ct. 1920, 80 L.Ed.2d 466 (1984). That was a rape case where the victim, a 15–year–old girl, was the only witness. Having been unconscious during much of the

traumatic episode, the victim had considerable difficulty in identifying Mr. Smith as her attacker. She was not able to settle on a photograph of him until told that the man depicted in another of the photographs shown her had been in jail at the time of the attack. When she first confronted Mr. Smith in a police show up, moreover, she told the police "that's not him." The police then had her confront Mr. Smith two more times, requiring him on the first such occasion to shrug his shoulders and on the second to put his hands around a police officer's throat. Only after she saw the simulated choking did the victim say she was sure Mr. Smith was her attacker. The state court of appeals affirmed the conviction, in a decision considering each of the factors enumerated in *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, *supra,* and this court held that the state court's findings of fact were entitled to a presumption of correctness under 28 U.S.C. § 2254(d). Accepting the state court's findings, this court held that the identification had sufficient indicia of reliability to make it constitutional for the jury to be allowed to determine the ultimate weight to be given it.

I find it difficult to reconcile the decision in the case at bar with the decisions of this court in *Smith v. Perini,* 723 F.2d 478, *supra,* and *United States v. O'Neal,* 496 F.2d 368, *supra,* and I fear that this may be one of those proverbial "hard cases" that make bad law—law that may return to haunt us in future cases of armed robbery, or rape, or other such crimes where eyewitness identification is often important and often lacks absolute certainty. The power that Congress has given the federal courts to review state criminal proceedings on prisoners' applications for writs of habeas corpus is a limited power, and we might see that power limited even further if we fail to exercise appropriate restraint in its use. The Supreme Court has very pointedly reminded us of the high cost—to society and to our federal system—that liberal allowance of habeas corpus entails. *Engle v. Isaac,* 456 U.S. 107, 126–29, 102 S.Ct. 1558, 1571–72, 71 L.Ed.2d 783 (1982). By undermining the usual principles of finality of litigation, it may frustrate both deterrence and rehabilitation. *Id.* at 127, n. 32, 102 S.Ct. at 1571, n. 32. It degrades the prominence of the trial itself and may render retrial difficult or impossible. *Id.* at 127, 102 S.Ct. at 1571. Primary authority for enforcing the criminal law rests with the several states, and "[f]ederal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Id.* at 128, 102 S.Ct. at 1572.

Willie Thigpen has had his day in court. He has been found guilty by a jury of his peers in a fair trial where none of the relevant testimony that he cared to give was withheld, where none of the relevant testimony that the victim was able to give was withheld either, and where all of the testimony given was directly relevant. Willie Thigpen's conviction was unanimously affirmed by a court of appeals the judgments of which merit no less respect than our own. The authors of our federal constitution neither contemplated nor said that someone in Mr. Thigpen's position has a constitutional right to relitigate his conviction indefinitely. Federal intrusion into Michigan's criminal processes is not warranted under the circumstances of this case, in my judgment, and I would have affirmed the denial of the writ.