NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0254n.06
Filed: May 14, 2008

No. 06-2543

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee,* | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| DESHAWN MARQUIS PICKETT, | ) | **O P I N I O N** |
| | ) | |
| *Defendant-Appellant*. | ) | |

BEFORE:    GUY, SUHRHEINRICH, and COLE, Circuit Judges.

**R. GUY COLE, JR., Circuit Judge.**  Following a jury trial, Defendant-Appellant Deshawn

Marquis Pickett was convicted of three counts of bank robbery in violation of 18 U.S.C. § 2113(a).

Pickett appeals the denial of his pretrial motion to suppress three witnesses' identification testimony.

For the reasons below, we **AFFIRM**.

## I. BACKGROUND

### A. Facts

On May 21, 2004, the Charter One Bank located in Harper Woods, Michigan was robbed.

A male approached the counter and handed teller Donyle Jones a note that said "give me all your

money and don't give me the ink pad." Jones complied and placed the money from her drawer into

a bag. The robber then left the bank with the money. Following the robbery, Jones told the

investigating police officers that she was very close to the robber, that she had an opportunity to view his face, and that she would be able to recognize him. Jones described the robber as a fair-skinned black male with a wide face and heavy beard, between 5'7" and 5'9" tall, and weighing between 240 and 250 pounds.

On September 22, 2004, the same Charter One Bank was robbed again. This time, the robber approached teller Tamika Styles while holding a wad of money in his hand. When she asked if he needed a deposit slip, the robber responded that he had one and then handed her a note that said "give me all your money or I'll shoot, don't push any buttons." After he received the money and confirmed that the drawer was empty, the robber walked out of the bank. Following the robbery, Styles reported to police that the robber stood about a foot from her, that he appeared nervous, that his hands were unsteady and that he was double-jointed. She described him as a black male, around 5'8" tall and 200 pounds in weight, who had a goatee and dreadlocks. Styles told officers that she was frightened during the robbery, that she had an opportunity to view the robber, that she was focused on him, and that she would be able to recognize the robber if she saw him again.

On October 1, 2004, the Charter One Bank located in Royal Oak Township, Michigan, was robbed. Erica Reece, a teller, reported to police that the robber approached her and handed her a deposit ticket that said "give me all the money, no dye packs, don't push any buttons for roughly two minutes after I leave." Reece gave the robber the money from her drawer, and tried to get more money from another teller upon the robber's request, which was accompanied by a threat to shoot Reece. When Reece was unable to obtain more money, the robber left with the money handed to him by Reece. After the robbery, Reece described the robber as between between 5'9" and 6'0" tall,

with a full beard, about 30 to 35 years old, and possibly of mixed descent ("black and Spanish looking"). Reece believed that she would be able to identify the robber if she saw him again.

Because of these robberies and several others that occurred in the Greater Detroit area, police officers from several jurisdictions met to pool their information and develop an investigation strategy. Following this meeting, officers released surveillance photos of the robberies to local news stations. An anonymous caller, who saw the released photos on television, believed the suspect was Pickett. Police officers thereupon gave Charter One's Senior Fraud Investigator John Jarvis two photos taken from Pickett's driver's license. From these photos, Jarvis created a wanted poster with Pickett's image and placed the poster at the banks that had been robbed, the corporate office, in his office, and at a few other banks in the vicinity.

All three tellers identified Pickett as the robber at some point prior to and during Pickett's trial. Styles's initial identification was made during a police-conducted photographic array display on November 3, 2004, prior to the creation of the wanted posters and approximately six weeks following the robbery. Jones observed the poster in July 2005 on the wall in Jarvis's office as she waited to discuss the upcoming police lineup. Reece worked at a branch in which the poster had been placed, and thus saw it multiple times a day for the two months that it was posted. Both Jones and Reece initially identified Pickett during a July 15, 2005 police-conducted lineup, fourteen months and eight months, respectively, after each had been robbed, and after both had viewed Pickett's wanted poster.

**B. Procedural History**

On July 20, 2005, Pickett appeared for his preliminary hearing for the October 1 robbery, at which Styles identified Pickett as the person who robbed her. On July 26, 2005, a grand jury indicted Pickett for all three robberies. On May 23, 2006, Pickett filed a Motion to Suppress Identifications and Request for an Evidentiary Hearing.

On June 19, 2006, an evidentiary hearing was held to consider the motion. Jones and Styles identified Pickett as the robber; Reece could not be located at that time. The district court denied the motion as to Styles's and Jones's identifications, and stated that if Reece could be located, he would consider the motion to suppress her testimony prior to the start of trial. Reece was subsequently located, identified Pickett as the robber at an evidentiary hearing prior to the start of trial. The district court then denied the motion to suppress with respect to Reece's testimony. On July 27, 2006, following a three-day trial, the jury returned a guilty verdict on each of the three counts. The district court sentenced Pickett on November 27, 2006 to a term of imprisonment of 100 months and a two-year period of supervised release on each count, to run concurrently. Pickett filed a timely notice of appeal to this Court, arguing that the district court erroneously denied his motion to suppress the witnesses' identifications.

## II. ANALYSIS

**A. Standard of Review**

We review a district court's ruling on a motion to suppress testimony using a clearly erroneous standard for factual findings and a de novo standard for legal conclusions. *United States*

*v. Dotson*, 49 F.3d 227, 229 (6th Cir. 1995). We "afford a presumption of correctness to the [trial] court's factual findings concerning [the reliability of the identification]," but "whether the factors demonstrate reliability in the identification process is a question of law for the court to decide." *Thigpen v. United States*, 804 F.2d 893, 896 (6th Cir. 1986) (per curiam) (citing *Sumner v. Mata*, 455 U.S. 591 (1982)).

**B. Legal Standard**

Pretrial identification procedures violate the due process rights of a defendant where the procedures are "unnecessarily suggestive and conducive to irreparable mistaken identification." *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967). In *Neil v. Biggers*, 409 U.S. 188 (1972), the Supreme Court held that identifications obtained through suggestive means may still be admissible if they are reliable, *id.* at 196-99, and has since reiterated that "reliability is the linchpin in determining the admissibility of identification testimony." *Manson v. Braithwaite*, 432 U.S. 98, 114 (1977). "[B]ecause it 'is the likelihood of misidentification that violates a defendant's right to due process,' only the effects of, rather than the causes for, pre-identification encounters should be determinative of whether the confrontations were unduly suggestive." *Thigpen*, 804 F.2d at 895 (internal citations omitted). The "[C]ourt is obligated to review every pre-trial encounter, accidental or otherwise, in order to insure that the circumstances of the particular encounter have not been so suggestive as to undermine the reliability of the witness' subsequent identification." *Id.* (quoting *Green v. Loggins*, 614 F.2d 219, 223 (9th Cir. 1980)). "Unnecessary suggestiveness depends upon whether the witness's attention was directed to a suspect because of police conduct." *Haliym v.*

*Mitchell*, 492 F.3d 680, 704 (6th Cir. 2007) (quoting *Howard v. Bouchard*, 405 F.3d 459, 469 (6th

Cir. 2006)).

If it is determined that the confrontation procedure was suggestive, "the central question"

becomes "whether under the 'totality of the circumstances' the identification was reliable even

though the confrontation procedure was suggestive." *Neil*, 409 U.S. at 199. "We consider 'the

reliability of the identification in determining its admissibility; if an identification is reliable, it will

be admissible even if the confrontation procedure was suggestive.'" *Keene v. Mitchell*, No. 05-3538,

2008 U.S. App. LEXIS 8926 (6th Cir. 2008) (quoting *Carter v. Bell*, 218 F.3d 581, 605 (6th Cir.

2000)).

> [T]he factors to be considered in evaluating the likelihood of misidentification
> include the opportunity of the witness to view the criminal at the time of the crime,
> the witness' degree of attention, the accuracy of the witness' prior description of the
> criminal, the level of certainty demonstrated by the witness at the confrontation, and
> the length of time between the crime and the confrontation.

*Neil*, 409 U.S. at 199-200. *See also, e.g.*, *Manson*, 432 U.S. at 114; *Thigpen*, 804 F.2d at 896. If the

Court determines that the circumstances do not indicate a "very substantial likelihood of irreparable

misidentification," then the identification evidence should be admitted at trial and the reliability of

the identification is "for the jury to weigh." *Manson*, 432 U.S. at 116. When this evidence is

presented to the jury, "[c]ounsel can both cross-examine the identification witnesses and argue in

summation as to factors causing doubts as to the accuracy of the identification - - including reference

to both any suggestibility in the identification procedure and any countervailing testimony." *Id.* at

113 n.14.

**C. Application of *Neil v. Biggers***

      1.      <u>Styles's Identification of Pickett</u>

Styles was robbed on September 22, 2004. On November 3, 2004, she was asked to come to the police station to view a lineup. Styles was shown a photographic array of six men and "immediately" picked out Number 2, Pickett, as the robber. She stated that "Number 2 is the guy only with a wider nose. He robbed us," which the officer recorded on the identification record that Styles then signed.

Pickett makes no argument that Styles's identification was influenced by suggestive procedures. Styles viewed a photographic array of six men with similar features and was able to pick Pickett out of the array. While Styles indicated that she believed the robber had a wider nose than the picture of Pickett used in the lineup, this information was presented to the jury and they were given opportunity to weigh the credibility of Styles's identification. Accordingly, because Pickett has not shown that the identification process was unduly suggestive, Styles's identification testimony was properly admitted. *See United States v. Marks*, 209 F.3d 577, 586 (6th Cir. 2000).

      2.      <u>Jones's and Reece's Identification of Pickett</u>

There is no evidence that Jones's and Reece's viewing of the wanted posters was unduly suggestive or prone to misidentification. Even if there were such evidence, however, both identifications are supported by sufficient indicia of reliability and are reliable under the totality of the circumstances. *See Neil*, 409 U.S. at 199.

Jones testified that she saw the robber for between one and three minutes, that she was extremely close to the robber, and that she would be able to identify him. The crime occurred during

daylight and in a well-lit building, but the suspect had a beard and long hair at the time, thus obstructing her view of his face. Jones testified that she was frightened during the time and that, as a bank teller, she was given training prior to starting to her job to be generally observant while working as a teller. Further, she gave a detailed description of the suspect immediately following the robbery, suggesting that she was able to pay attention to the robber during the crime. Jones was also able to give a specific and detailed description of the suspect, suggesting that her identification was reliable. The amount of attention that Jones was able to give to the robber supports a finding of reliability, as "[t]his Court is more likely to find an identification reliable where a witness 'was able to view the assailant with a heightened degree of attention, as compared with disinterested bystanders or casual observers." *Haliym*, 492 F.3d at 705 (quoting *Howard*, 405 F.3d at 473). The viewing of the wanted poster, the time that passed between the robbery and the identification, and Jones's inaccurate estimate of the robber's height do not create the type of circumstance that indicates a "very substantial likelihood of irreparable misidentification," *Manson*, 432 U.S. at 116; absent such a circumstance, the identification evidence was properly admitted and the reliability was properly "for the jury to weigh." *Id.*

As for Reece, the district court made findings regarding the reliability of her identification of Pickett, and its findings are supported by the record:

> She testified as to the - - where she was, what her opportunity was to view the criminal activity and the person that was conducting that criminal activity. She demonstrated for us while sitting at the stand, she said two feet and then showed us in proportion of where she was located. She testified that the attention that she was paying to it, the accuracy of her identification, the sureness of her identification, I think all of those elements were quite strong in relation to her testimony.

(Joint Appendix 137.) In addition, the record demonstrates that, like Jones, Reece viewed the robber at a close distance and for a matter of minutes. Although the robber's full beard may have lessened Reece's view of Pickett's facial features, the crime occurred during daylight and in a well-lit area of the bank. Reece also testified that, as a bank teller, she was given training prior to starting her job to be generally observant. Further, she gave a detailed description of the suspect immediately following the robbery, suggesting that she was able to pay attention to him during the crime. Reece estimated Pickett's height as between 5'9" and 6'0", not far from the 6'2" listed on his driver's license. Reece also indicated that she would be able to identify the robber if she saw him again. Reece's identification is thus supported by many indicia of reliability, and the attention she was able to give to the robber again support admission of her identification. *See Haliym*, 492 F.3d at 705. The circumstances surrounding the identification, including her repeated viewings of the wanted poster, do not indicate that the presence of the wanted poster "gave rise to a substantial likelihood of irreparable misidentification." *Id.* at 704 (quoting *Manson*, 432 U.S. at 107).

Because the tellers' identifications of Pickett as the robber were not so unreliable as to lead to a substantial likelihood of irreparable misidentification, we decline to reverse the district court's denial of Pickett's motion to suppress. As stated by the Supreme Court,

> We are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.

*Manson*, 432 U.S. at 116. Here, because any untrustworthy elements of the witnesses' identifications were available for the jury to consider, the district court did not err in denying Pickett's motion to suppress the eyewitness testimony.

## IV. CONCLUSION

For the reasons above, we **AFFIRM**.