**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Willie B. O'NEAL, Defendant-**
**Appellant.**

**No. 73–1712.**

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 6, 1973.

Decided May 2, 1974.

James R. Willis, Cleveland, Ohio, for defendant-appellant.

Nancy C. Schuster, Asst. U. S. Atty., Cleveland, Ohio, for plaintiff-appellee; Frederick M. Coleman, U. S. Atty., Cleveland, Ohio, on brief.

Before PHILLIPS, Chief Judge, and EDWARDS and MILLER, Circuit Judges.

EDWARDS, Circuit Judge.

This is a direct appeal from appellant's conviction after jury trial on two counts of bank larceny, in violation of 18 U.S.C. § 2113(a) and (b) (1970). Appellant was sentenced to eight years on each count under 18 U.S.C. § 4208(a)(2) (1970), with the terms to run concurrently.

The indictment charged that appellant was one of two men who entered a bank in Mentor, Ohio, on September 12, 1972, at 11:15 a. m. dressed in Brinks messenger uniforms and received the polite assistance of bank employees in removing a shipment of $316,500 worth of cash destined for the Federal Reserve Bank and two department stores. The fake messengers thereupon made off with this cash hoard and little (if any) of it has ever been recovered.

There were eight people who saw the two fake messengers, one of whom was black and one white. After appellant's arrest all eight of these witnesses were present at properly conducted line-ups where appellant was in the line-up and was represented by a lawyer. None of them selected appellant on the first line-up. Two of the witnesses (female tellers who arguably had the best opportunity to observe him at the bank) did identify him positively at a second line-up as the black bogus Brinks man. Each of these tellers testified that, after picking another person from the first line-up, she had, on her own initiative, sought another opportunity to view the line-up and then had identified appellant. This positive identification was repeated at appellant's trial where, of course, the prior misidentification was thoroughly aired.

Other than the disputed identification evidence, there is strong circumstantial evidence in this case. One of appellant's girlfriends, Kathleen Lipchek, testified that appellant had told her sometime before the robbery that he was going to come into a large sum of money. He mentioned $400,000.[1] He also told her

1. Lipchek's testimony included the following: "Q Calling your attention to the later part of August of 1972, did the defendant, O'Neal, say anything unusual about

that he was in "a big job" with several others, that he wished he could get out but it was too late. This witness also testified that appellant had a moustache and a goatee which he shaved off shortly before the robbery. She also testified (albeit we and presumably the jury noted that her assertion was weakened on effective cross-examination) that she saw a uniform in appellant's apartment. On the day of the robbery she said appellant told her he was taking his children to Chicago or Mississippi; that she might not see him again; that he might be dead.

In fact, appellant left town immediately after the happening of the crime. He was arrested in Mississippi with approximately $3,500 cash on his person in denominations (mostly $50 and $100 bills) similar to those which had been stolen. These bills were, however, unidentifiable, since no numbers had been kept. Appellant had not worked for eight months before the trip to Mississippi. One of the FBI Agents who arrested appellant testified that he had a several days' growth of beard and a "light" moustache when arrested.

Appellant took the stand and denied being in the bank. He explained his possession of $3,500 in cash on the basis of a numbers hit. He called as a witness a male relative who had been caring for appellant's children and who testified that appellant was at his house at the time when the bank robbery was taking place.

Of the six persons (other than the two female tellers) who had been in the bank at the time of the larceny, three were unable to make any identification. The District Judge refused to allow the defense to call these witnesses to testify before the jury. But the District Judge allowed the remaining three who identified as "familiar" persons in the line-up other than appellant to be called by the defense for examination before the jury.

Appellant claims reversible error in the District Judge's admission of the in-court identification of appellant by the two female tellers and in the District Judge's refusal "to specially instruct the jury as to the possible perils involved in personal identification evidence."

Appellant also asserts that the admission into evidence of the $3,500 in cash which appellant had on his person was reversible error and that he was entitled to acquittal because the government's evidence was insufficient to allow a jury finding of guilty beyond reasonable doubt.

We shall take the last two appellate issues first.

■ This court has repeatedly held that it is permissible for the prosecution

---

what might be happening in the future?
A He said he would be coming—
MR. WILLIS: Objection.
THE WITNESS: Pardon me?
A He said he would be coming into—
THE COURT: I will overrule the objection.
Q Yes?
A He said he would be coming into some money.

\* \* \* \* \*

Q Did he mention anything about amount?
A Yes. $400,000.

\* \* \* \* \*

Q During this conversation where he said he would be coming into this $400,000, did he mention anything else?
A He said he would be working with a few people and he said he would be coming into the money rather quickly.

Q Now, he said 'a few people.'
Did he say anything more relative to these people?
A Oh, he said not to remember the names or any faces that I saw, you know, around the apartment and the people he was talking to.
Q And did you see people at the apartment?
A Well, people came and went. Yes, I did.
Q And what were the race of these people?
A White.
Q Now, when he said not to remember these people, did he say anything else?
A Yes. He said if I remembered them— he said not to remember anything I saw or I might end up in the lake."

to show unusual wealth in the hands of a previously impecunious defendant immediately subsequent to the happening of a theft of money. United States v. Amerine, 411 F.2d 1130 (6th Cir. 1969); United States v. Daniels, 377 F.2d 255 (6th Cir. 1967); *See also* United States v. Gornick, 448 F.2d 566 (7th Cir.), cert. denied, 404 U.S. 861, 92 S.Ct. 161, 30 L. Ed.2d 103 (1971). Here when appellant was arrested he had 16 $100 Federal Reserve Notes and 37 $50 Federal Reserve Notes, plus a few smaller bills on his person.[2] The bank shipment had encompassed 200 $50 bills and 110 $100 bills. Appellant had testified that he had not held a job for six to eight months in the period immediately preceding the happening of this crime.

Appellant, however, also testified to his activities as a gambler during that period and claimed to have hit the numbers for $6,000 just before he left Cleveland. We believe that the conflict of evidence and inferences here involved was for the jury's determination.

 Nor do we agree with appellant's contention that the District Judge erred in failing to grant his motion for acquittal. The government's evidence (assuming for the moment that it is all admissible) was sufficient to make a prima facie case for the jury.

The real problem of this appeal pertains to the identification evidence. Here appellant accurately contends:

1) That eight witnesses saw the two bogus Brinks men;

2) None of the eight identified appellant's picture when they were shown it by the FBI;

3) At the first line-up none of the eight identified appellant, although he was in the line-up;

4) Three of them identified another party, one Eli Felder, while two other witnesses identified still other parties; and

5) The only two witnesses who did identify appellant as one of the bogus Brinks men had previously misidentified another party.

 Absent other facts, such a set of circumstances might well warrant striking from the record the proffered subsequent identification of the defendant. This, however, was no ordinary bank robbery where a sudden threat of death focuses all of the senses of those threatened upon the one who by words or action says, "The money or your life!"

Our instant crime was committed not by force, but by ruse. The bogus Brinks men appeared to bank employees and customers to be engaged in operations normal to the bank's routine. There was no special circumstance for six of the witnesses to focus on the persons or the faces of the "Brinks Messengers." On these grounds alone we dismiss concern about three of the witnesses (all bank customers) who never asserted either before or after the show-up that they could identify the culprits.

As to the failure of any of the witnesses to identify a picture of appellant when shown it by the FBI, we note that the picture employed showed appellant with a full moustache and a goatee. The witnesses at the bank were unanimous in describing the black bogus Brinks man as clean-shaven. In addition, the jury had before it the testimony of Kathleen Lipchek (appellant's girlfriend) who asserted that appellant shaved off his moustache and goatee just before the happening of the crime. They also had before them appellant's statement that he didn't shave it all off but that three or four days before he left Cleveland he "cut it down with clippers." They also had before them the statement of an FBI Agent who arrested appellant in Lexington, Mississippi, 10 days after the crime that appellant had a several days' growth of beard and a "light moustache." On these facts the

2. Appellant also contends that the court order these funds returned to appellant. We agree with the District Judge that this issue should be determined in another proceeding than this criminal trial.

jury had a right to find that the black bogus Brinks man was clean shaven at the time of the crime. On this assumption it would have been remarkable had any eye-witness been able to identify appellant's picture with a full moustache and goatee.

As to the misidentifications, some facts must be added. The line-up consisted of six young black men of the same general age. One had been added at the insistence of appellant's lawyer. The picture of the second line-up which was introduced in evidence shows a considerable similarity of appearance between appellant and Felder. None of the eye-witnesses at the first line-up made any positive identification.[3]

The District Judge allowed appellant's counsel to call all of those witnesses who misidentified and examine them thoroughly before the jury.

What we have said leaves the question of whether or not the District Judge should have striken the testimony of Mary Lou Grentz and Terri Kinkaid, the two women tellers who did positively identify appellant. Both of these tellers had direct contact with the two bogus guards. Both of them were kept apart from each other at all times. Both of these witnesses identified another person at the first line-up, albeit not positively. Both of them asked for a second line-up and at it positively identified appellant. Both of them positively identified appellant at trial. Although the question is not without difficulty, we conclude that the jury was entitled to and did have all the relevant evidence as to identification and misidentification. The initial misidentification on the part of these eye-witnesses to a crime did not completely destroy the value of their testimony or render it inadmissible. The jury was fully advised of the original mistake and had it as well as the subsequent testimony identifying appellant before them to weigh. The weight to be given this evidence was for the jury to determine. United States v. Black, 412 F.2d 687 (6th Cir. 1969), cert. denied, 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970).

We believe that there is no evidence in this case of any deviation from the line-up standards enunciated in the *Wade, Gilbert* and *Stovall* trilogy. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The testimony indicates that meticulous attention was paid by the FBI Agents who conducted the line-ups to the standards enunciated in the cases cited above.

The District Court did not commit reversible error in refusing to suppress the testimony of witnesses Grentz and Kinkaid. *See* United States v. Cairns, 434 F.2d 643 (9th Cir. 1970).

3.

| Witness | Position | First Ident. | Second Ident. | Called By | Testified Before Jury |
|---|---|---|---|---|---|
| Grentz | Employee | #1 "familiar" | #4 (defdt) "positive" | Govt. | Yes |
| Kinkaid | Employee | #2 "toss-up betw. #2 & #4" | #4 (defdt) "positive" | Govt. | Yes |
| Aikey | Customer | #1 "familiar" | NA * | Defns. | Yes |
| Painter | Employee | #6 "not positive" | NA | Defns. | Yes |
| Mansfield | Customer | No ident. | NA | Defns. | No |
| Parton | Customer | No ident. | NA | Defns. | No |
| Misley | Customer | No ident. | NA | Defns. | No |
| Wise | Employee | #1 "familiar" | NA | Defns. | Yes |

* Not applicable (did not request second identification)

Finally, appellant claims that even if the eye-witnesses' testimony was admissible, the District Judge should have cautioned the jury about the dangers of misidentification and instructed the jury about how to weigh that evidence. We agree with these propositions, but on review of Judge Green's careful 30-page instruction, we are compelled to conclude that this is what he did. Perhaps in devising a model instruction on eye-witness identification some additional cautionary language might be added. See Model Instructions in United States v. Zeiler, 470 F.2d 717, 720 n. 4 (3rd Cir. 1972); United States v. Telfaire, 152 U.S.App.D.C. 146, 469 F.2d 552, 558–559 (1972). But if so, appellant has a duty to assist the court in providing appropriate requested instruction and a review of those submitted leads us to agree with the District Court's refusal to give them on the grounds that they were essentially arguments of appellant's case.

The judgment of the District Court is affirmed.