William L. **DUPUIE**, Petitioner-Appellant,

v.

Charles E. **EGELER**, Warden, Respondent-Appellee.

No. 76–1858.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 9, 1977.

Decided April 4, 1977.

William L. Dupuie, James T. Bilicki, Hall & Andary, P. C., Detroit, Mich., for petitioner-appellant.

Frank J. Kelley, Atty. Gen. of Mich., Robert A. Derengoski, Thomas L. Casey, Lansing, Mich., for respondent-appellee.

Before EDWARDS, CELEBREZZE and LIVELY, Circuit Judges.

EDWARDS, Circuit Judge.

This is an appeal from denial of appellant Dupuie's petition for writ of habeas corpus entered by a District Judge in the Eastern District of Michigan, Southern Division. Appellant is serving a life sentence for murder committed in the course of a felony. His petition was denied, without evidentiary hearing, on the basis of the state trial record.

The facts of the crimes involved are in dispute. Appellant's claim is that constitutionally impermissible methods were employed to arrive at the testimony which convinced the jury that he was one of the two perpetrators, when in fact, he was not. He relies particularly upon *Wade v. United States*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). His retained counsel's brief also cites *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

Appellant's pro se brief recites the following facts which (except for footnote 2) are not in question on this appeal:

> Mr. and Mrs. Leftkowitz were an elderly couple who had returned to their apartment the day in question after having seen a dentist who had worked on Mrs. Leftkowitz. At approximately 9:45 p. m., that evening the telephone rang in their apartment. Mrs. Leftkowitz was lying down in their living room and her husband answered the telephone. Someone called and said they had some mail that belonged to the Leftkowitz [sic] and that they were sending their son over with it. Mrs. Leftkowitz became suspicious and called the manager of the complex, and asked her if anyone lived in the complex who had a boy old enough to deliver mail at that time of night. While she was on the phone with the manager, Mrs. Bernstein, two men broke into their apartment carrying guns. Of the two men, one was larger than the other. The smaller man was ultimately identified at the trial by Mrs. Leftkowitz as being petitioner.[2] The smaller of the two men

[2] It should be noted that the smaller man who entered the apartment on the night in question had his face completely covered with a Halloween-type-mask.

> forced Mrs. Leftkowitz to put down the telephone and ordered her into the bedroom. She testified that the two men ordered her and her husband to go into their bedroom where they were taped and forced to lay on the floor. Mrs. Leftkowitz testified that the smaller man rifled through the dresser drawers until he found an envelope containing the $1000.00. At this point a knock came on

the window of their bedroom. The robbers, having found the money, then fled the bedroom and left the apartment. Mrs. Leftkowitz also testified she then heard some shooting.[3]

[3] The police were immediately called and upon arriving they found Trooper Lindberg lying in the hallway outside the Leftkowitz' apartment. The cause of death being gunshot wounds to the chest.

Other testimony served to establish that when the smaller of the two robbers forced Mrs. Leftkowitz to put down the phone, the building manager, to whom she was talking, became alarmed and called Carl Lindberg, a Michigan State Trooper who lived in the same apartment complex, and asked him to investigate. After the two robbers had left the Leftkowitz apartment, shooting was heard. No eyewitness testified to seeing the actual murder, but Trooper Lindberg was found dead of a bullet wound.

Appellant's claims of constitutionally impermissible identification proceedings were stated as follows in connection with his habeas petition in the District Court:

(a) That the victim had been shown a picture of Petitioner prior to the lineup conducted by the Detroit Police Department but was not able to make an identification at that time. The victim's later in-court identification and testimony was unclear, contradictory, and rather uncertain as to the identity of Petitioner as the smaller man involved in the robbery.

(b) The victim was not able to identify anyone as being the smaller man. The police then employed a mask (after several alterations were made thereon) which was similar to the one used on the night in question. Based solely upon the mask furnished by the police, the victim made her identification. Petitioner was compelled to put on a mask which had been altered to police specifications.

(c) That on the evening before the lineup, the Detroit News carried a picture of Petitioner on the front page of its evening edition along with a headline story to the effect that a warrant had been issued for Petitioner in the slaying of trooper Lindberg. The victim saw this picture in the newspaper. In its ruling denying defense's motion to strike the victim's in-court identification and testimony, the trial court ruled that such testimony affected only the weight of her credibility as a witness and not the admissibility. Such suggestive identification procedures employed were so unnecessarily suggestive and conducive that Petitioner was thereby denied due process when the victim's later in-court identification was made and subjected only to the attack of credibility.

Both the Memorandum Opinion and Order of the District Judge, dated April 17, 1974, and the earlier Michigan Court of Appeals opinion in appellant's direct appeal (*People v. Dupuie*, 31 Mich.App. 14, 187 N.W.2d 260 (1971)) deal adequately with these contentions and we hereby incorporate them by reference.

We note that appellant (and codefendant Payne) *had* been represented by counsel at the line-ups where Mr. and Mrs. Leftkowitz first identified him and had voiced no objections to the fairness of the line-up. The prosecution relied only upon in-court identification of Dupuie by both Mr. and Mrs. Leftkowitz and did not introduce any line-up identification on direct examination. Although there was testimony that the smaller of the robbers was masked, and the Leftkowitzs' identifications were made only after they saw Dupuie wearing a similar mask, the same mask had been worn in turn by each of the line-up participants. Prior unsuccessful attempts at photo identification had occurred before appellant was arrested and the two Leftkowitzs denied (Mrs. Leftkowitz with some equivocation) that they had seen the Detroit News photographs of appellant published at the time of his arrest *before* their identifications at the line-up.

■ Like the District Judge and the Michigan Court of Appeals, we believe the facts in this case serve amply to distinguish it from *Wade v. United States, supra; Stovall v. Denno, supra; Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) and *Simmons v. United States, supra*,

and warrant our affirmance as to all legal issues clearly identified.

What particularly concerned this court after briefing of this case and oral argument, however, was a somewhat different issue which we deem to be presented at least by implication. This is whether or not appellant's conviction could, within federal due process standards, rest wholly or in material part upon Mrs. Leftkowitz's vague and ambivalent identification of appellant while "his face [was] completely covered by a Halloween-type mask." This concern led to our calling for additional briefing, and our own examination of the entire transcript of the state court trial.

Such examination produced the following facts:

Mr. Leftkowitz's identification of appellant as the smaller bandit was positive:

(On Direct Examination)

Q Did they take any other money from the place?

A Yes, took a thousand dollars.

Q Anything else?

A And some dimes and quarters.

Q Do you see either of the two men that you are describing here in this courtroom?

A Yes, I do.

Q Will you point out and indicate the men that you recognize as being the men that did these things?

A The man sitting on that side, he taped my hands.

Q What did the other man do?

A The other man was going through the drawers.

Q Is that man in the courtroom?

A Yes, the small man sitting there alongside of him.

MR. WEISWASSER: Let the record show the witness has identified the defendants William Dupuie and James Payne.

Q (By Mr. Weiswasser): Now, you say that the man on the left here—

A The man there, yes, he taped my hands.

Q He is the one that taped you up?

A He stood at me with a gun all the time.

Q And the other man is the one that went through the drawers?

A Yes, he did.

\* \* \* \* \* \*

(On Cross-examination)

Q Now, there were six men in the line-up, do you remember that?

A Yes, I do.

Q Okay. These men were asked to place a mask on their face?

A Yes.

MR. BURKE: May I see that mask?

Q (By Mr. Burke): Does this look like the mask they were asked to place on their face?

A Yes.

Q All right. Now, you viewed them all without the mask on and you looked at them with the mask on, isn't that right?

A Yes.

Q I would estimate that the total time you and I were in there, or that you were in there, would be somewhere around fifteen minutes?

A Something like that, yes.

Q Okay, all right. Now, you were not able at that time to identify William Dupuie as the man who was wearing this mask in your apartment on the night of May 26th, isn't that right?

A I identified him, yes, I recognized him right away.

Q You say you recognized him right away?

A Yes.

No objection was made at trial as to this testimony and no issue is presented as to it upon this appeal. The record also discloses that in fact the face mask was *not* a mask which "completely covered" the smaller robber's face. It was a Halloween mask consisting of fake glasses without lenses and a fake nose, with fake eyebrows above and a fake moustache below. The eyes and much of the face were visible.

As noted above, appellant Dupuie was identified by the Leftkowitzs (positively by

Mr. Leftkowitz) as the smaller of the two robbers who had rifled the drawers, pulling out papers until he found an envelope containing $1,000 of the Leftkowitz' savings.

At trial an expert witness from the Detroit Police Department testified that three latent fingerprints lifted from an envelope found on the floor of the Leftkowitz' apartment after the murder were the fingerprints of appellant William Dupuie. The record allows the implication that this identification led to Dupuie's arrest.

There was expert testimony at the trial that the bullet which killed Lindberg was fired from a gun which James C. Payne (appellant's codefendant) had borrowed (or taken) from one Albert Swift. Swift identified Payne at trial as the man who had taken his gun. Payne was also positively identified by both Mr. and Mrs. Leftkowitz as the larger and unmasked robber. Payne was convicted of first degree felony murder at the same trial at which appellant Dupuie was convicted in Detroit Recorder's Court and received the same life sentence. Although there is not a line in this record to connect appellant and Payne, other than the testimony pertaining directly to the robbery and murder, these facts are important in establishing (for purposes of a felony murder conviction) that the murder was committed by one of the two men who were identified as being the robbers of the Leftkowitz' apartment.

Finally, we turn to the testimony of Mrs. Leftkowitz which was strenuously objected to as so vague and contradictory as to be inadmissible.

On direct examination Mrs. Leftkowitz testified:

> MR. BURKE: I wonder if the witness would clarify for the benefit of the jury, who was taping her, the big man or the little man.
>
> A  The big man.
>
> MR. BURKE: All right.
>
> A  The big man. The big man did the taping and the little man was pulling the drawers out and throwing everything out.

Q  (By Mr. Weiswasser): All right.

A  Because I was right on the floor and it's a small bedroom and, you know, you were close by to everything. And—

Q  When the big man was taping your husband, did you say anything to him?

A  I said "Please don't hurt him, he has heart trouble." And I said "Don't hurt him, please." I was on the floor.

Q  All right. Now, do you see either of those men in this courtroom?

A  Yes.

Q  Will you point out those that you recognize as being either one of those men?

A  I see both of them.

Q  Would you stand up and point out the two men?

A  Yes. This and that man there.

MR. WEISWASSER: Let the record show the witness has pointed to and identified the defendants in this case, the defendant William Dupuie and the defendant James C. Payne.

THE COURT: You may sit down, Mrs. Leftkowitz.

A  Okay.

Q  (By Mr. Weiswasser): Now, I believe you testified that the larger man, now who was the larger man? Which one of the two?

A  That man there.

Q  That would be Mr. Payne?

A  Yes.

Q  And would you please, as you refer to them from now on, try to remember the names and refer to them by name. And the other man was Mr. Dupuie?

A  Dupuie, yes.

Q  Who was the—Mr. Payne is, I believe, the larger man?

A  Yes.

Q  Is he the man who was tying you and—

A  He was taping us, yes.

Q  What was Mr. Dupuie doing at the time?

A  He was throwing things out of the drawers, and searching for things and throwing everything on the floor. I was lying there and he was throwing things and I had this money that I was going to buy some furniture with and pay and I had some bills there and I had it with my checkbook and I had it in an envelope.

On cross-examination Mrs. Leftkowitz testified:

Q  Why did you tell this jury, if you did before the luncheon recess, Mrs. Leftkowitz—

A  Yes?

Q  —that these are the men?

A  Because to me, I am sure they look like them and I am almost sure.

Q  Look like them?

A  Yes. I am almost sure. I was real close to the one without the mask.

Q  I wonder why then, Mrs. Leftkowitz, at the preliminary examination in this matter, you used the terms that you did on those two occasions? You do remember testifying at a preliminary examination in this matter on June 18, 1969, before Judge Robert Evans of this court?

A  Yes, sir.

Q  And in response to this question put to you by Assistant Prosecutor, Arthur Koscinski, and making this response, "All right now, do you see that man here in the courtroom today that came toward you with a gun in his hand and put the telephone receiver down? Answer—I think I do."

Remember that?

A  Yes.

Q  You thought you did back on the 18th of June, less than a month after these events that occurred. Are you going to tell us that now you are sure?

A  Yes, I am sure.

Q  Why?

A  Because I have seen him.

Q  You have seen him since then, haven't you?

A  What?

Q  You have seen them since in court, haven't you?

A  I saw them before.

Q  You saw them in court, didn't you? On October 28, Mrs. Leftkowitz, before Judge Joseph E. Mahar of this court, do you recall being asked this question by Assistant Prosecuting Attorney George Roskopp, and making this answer in reference to respondent Payne, "Now, do you see the man that was in the apartment in the courtroom at this time? Answer—Well, looks like him."

A  That's right.

Q  And being asked this question and having given this answer,

"Q  (By Mr. Roskopp): Was that the man in your apartment on that night?

A  I think it was."

Remember that?

A  Yes, yes, sir.

Q  Being asked this question and having given this answer,

"Q  (By Mr. Roskopp): You are now saying that this was the man in your apartment?

A  I think it was."

Now, as a matter of fact, as a matter of fact, Mrs. Leftkowitz, you just think this was the man now, don't you?

A  But you see, I told you I was sure it was because Judge Mahar heard me and repeated it to you.

Q  I beg your pardon?

A  When I said that, I am sure it was, I am sure it was.

Q  I wonder why you said "I think it was?"

A  Because I am sure it looks like him.

Q  Looks like him?

A  That's right, I said that, and it is him. Could I have a glass of water, please, sir?

The state judge overruled objections to the admission of Mrs. Leftkowitz's testimony, saying in part:

The problem here, if there is a problem, is how good the identification of Mrs. Leftkowitz is. And, of course, that in the

Court's judgment, is the factual question that the jury is going to have to handle.

As to Mr. Burke's argument as to the photograph, again it comes to a factual question of whether or not she did, indeed, see a photograph in the newspaper before she went to the line-up that influenced her. That's a factual question.

MR. BURKE: your Honor, on that point if I can just interrupt, if I could bring these newspapers—

THE COURT: Well, when you get them, I haven't denied your motion with prejudice. You can raise your motion again. But in the absence of showing me some law to the effect that per se, the showing of a photograph to someone in regards to an identification does violence to the constitutional rights of the defendant, I am prepared to hold that even if she did see the photograph prior to the confrontation, it would not be prejudicial to the rights of the defendant Dupuie.

In this appeal from denial of a writ of habeas corpus, we do not, of course, concern ourselves with claims of error in the admission or exclusion of evidence unless the error in some fashion offends a federal constitutional provision. We have already rejected appellant's claim that police conduct at photo displays or line-ups violated the constitutional standards of the *Stovall, Wade,* and *Simmons* cases.

We now decline appellant's invitation to lay down a per se rule that federal due process requires rejection of otherwise admissible identification testimony simply because the witness to a crime might have seen a newspaper photograph of the accused before his or her line-up or in-court identification. This case is poles apart from the trial and pretrial abuses in *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

We recognize fully that Mrs. Leftkowitz's identification was somewhat contradictory and uncertain. If it stood alone in this record (without the positive identification by Mr. Leftkowitz and the expert witness' identification of appellant's three fingerprints left at the scene), this would be a very different case.

The trial judge, however, admitted Mrs. Leftkowitz's identification for what it was worth, allowing ample cross-examination to develop its weakness for the jury's consideration.[1] Even if we were to weigh this decision against the standards of Rule 403[2] of the new Federal Rules of Evidence (which, of course, were not applicable to this state court trial), we probably would find no abuse of discretion. There were only two eyewitnesses to these crimes. Mrs. Leftkowitz was one of them. She saw the perpetrators at close range under conditions of good visibility and in moments of intense awareness. Mrs. Leftkowitz's identification was based on appellant's size, weight, and posture, as well as on what she could see of appellant's face, in spite of the Halloween mask. Against this total record, we do not see how the state judge's admission of Mrs. Leftkowitz's testimony can be considered a federal constitutional violation.

The judgment of the District Court denying habeas corpus relief is affirmed.

---

1. *See United States v. O'Neal,* 496 F.2d 368, 372 (6th Cir. 1974).

2. Rule 403 provides:
   *Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time*
   Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
   Fed.R.Evid. 403.