NOT FOR PUBLICATION
File Name:  06a0374n.06
Filed:  May 26, 2006

NO. 05-3246

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

        Plaintiff-Appellee,

                                     ON APPEAL FROM THE
v.                                   UNITED STATES DISTRICT
                                     COURT FOR THE NORTHERN
ERIC PEYTON,                   DISTRICT OF OHIO

        Defendant-Appellant.

_____/

BEFORE:    SUHRHEINRICH, GILMAN, and ROGERS, Circuit Judges.

        **SUHRHEINRICH, J.,** Defendant-Appellant Eric Peyton was found guilty of carjacking,

in violation of 18 U.S.C. § 2119; carrying and using a firearm during a crime of violence, in

violation of 18 U.S.C. § 924(c)(1)(A); being a felon in possession of a firearm, in violation of 18

U.S.C. § 922(g)(1); and unlawfully possessing an unregistered firearm, in violation of 26 U.S.C. §§

5861(d), 5871.  Peyton challenges his conviction and sentence on appeal.  For the reasons that

follow, we **AFFIRM**.

**I.  Facts and Procedural History**

        On April 29, 2004, at around 11:00 p.m., Jermaine Thomas pulled his 1987 Cadillac into a

Sunoco gas station at East 116th Street and Union Avenue in Cleveland, Ohio to get a drink.  As he

waited in line, he heard someone behind him say, "This is a robbery."  The gunman faced Thomas

and demanded his watch, ring, bracelet, and silver teeth caps, which Thomas surrendered.

        The gunman exited the building and began to cross the street.  Thomas, believing he was

now safe, headed toward his car so he could "hurry up and leave." As soon as Thomas opened the car door, however, the gunman ran back and demanded the car. Thomas just stood there and did nothing. The gunman then "sized [Thomas] up" and fired a bullet into his left thigh. The bullet went entirely through Thomas' left leg and struck his right leg also. The man then got inside Thomas' car and drove away.

Thomas was taken to the emergency room. A nurse found a bullet in Thomas' pants, put it in a sterile cup, labeled it, and gave it to police. A Cleveland police officer transported the bullet to a police evidence vault.

Cleveland Police Lieutenant Michael Connelley reviewed the gas station's surveillance tape from the night of the robbery. He concluded that the gunman was Defendant-Appellant Eric Peyton. Lieutenant Connelley then began a detail to arrest Peyton.

Several local law enforcement officers set up surveillance at the residence of Peyton's girlfriend, Tamika Williams. (Williams lived with her mother, who was the actual homeowner.) The police saw a car pulling out of the driveway with Peyton in the passenger seat. Detective Phillip Habeeb backed his van up along the driveway to block the car from leaving. The officers ran to the car with their guns drawn and badges pulled, and announced that they were arresting Peyton. Williams obeyed police orders to put the car in park, turn off the ignition, and throw the keys out the window. One of the officers threw open the passenger door.

Peyton refused to put his hands over his head, despite repeated orders to do so. Two officers pointed their guns at him through the opened passenger door, but Peyton said, "Those guns don't scare me." He then reached into his waistband and pulled out a .38 revolver. One of the officers quickly dove into the car and began to wrestle Peyton for the gun. The other officers dragged

Peyton out of the car and eventually one of the officers seized the gun. Once out of the car, Peyton "came up fighting," throwing punches wildly until the officers were able to secure him with handcuffs. A subsequent search of his person uncovered four rounds of .38 caliber ammunition.

After Peyton's arrest, Williams disclosed to the officers that Peyton had hidden a gun at her mother's house. The officers received written consent from Williams' mother to search the house. Williams then led them to a crawl space where they discovered a duffel bag containing a sawed-off shotgun and ammunition.

The officers seized the jewelry Peyton was wearing in case it had been the jewelry taken from Thomas at the gas station. (Thomas later told police that it was not.) Detective Habeeb watched Peyton remove one stud earring from each ear.

Having gotten "a good look at [the gunman's] features on his face" from the bright lighting inside the station and from the "pretty bright" lighting outside, Thomas positively identified Peyton shortly after his arrest in two different six-person photo arrays. He also identified Peyton at trial as the shooter.

On June 30, 2004, a federal grand jury indicted Peyton on four counts. Count 1 charged carjacking, in violation of 18 U.S.C. § 2119. Count 2 charged carrying and using a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A). Count 3 charged being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Count 4 charged the unlawful possession of an unregistered firearm, in violation of 26 U.S.C. §§ 5861(d), 5871. A grand jury later returned a superseding indictment that added sentencing specifications. The government also filed notice that Peyton was punishable as an armed career criminal.

At Peyton's jury trial, Williams testified that on the night of the robbery, Peyton told her that

he had robbed a man, taken his car, and shot him at a gas station located at East 116th and Union. She identified Peyton in still shots from the gas station's surveillance video. She also stated that Peyton had both ears pierced at the time of the robbery and that she had been with Peyton about three to seven days before his arrest when he got the second piercing.

The government called a ballistics expert with the Cleveland Police Department. He testified that the bullet recovered from Thomas' pants had been fired from the .38 revolver the police seized when they arrested Peyton. Peyton's expert testified that the evidence was insufficient to determine with scientific certainty whether the bullet was fired from Peyton's gun.

The primary defense theory was misidentification. The surveillance video apparently showed that the gunman had a piercing in both ears. Peyton argued that he could not have been the robber, since he only ever had one ear pierced. In support, Peyton called Nathan Sexstella, a professional body piercer, as an expert on piercings. Sexstella testified that, based on a physical examination of Peyton's ears, Peyton's right ear had never been pierced. On cross-examination, he acknowledged that he had been paid $100 to examine Peyton and another $150 for finding that the ear had never been pierced.

The jury found Peyton guilty on all counts. The district court denied Peyton's motions for judgment of acquittal and, in the alternative, for a new trial. The court sentenced Peyton to a term of imprisonment of 320 months,[1] a special assessment of $400, and $2150 in restitution, plus five years of supervised release.

## II. Issues

---

[1]Peyton received 200 months as to Counts 1 and 3 and 120 months as to Count 4, all to run concurrently, and 120 months as to Count 2, to run consecutive to Counts 1, 3, and 4.

-4-

Peyton raises nine issues on appeal: (1) whether the district court erred in denying Peyton's motion to suppress evidence obtained pursuant to his arrest; (2) whether the district court's decision to limit Peyton's cross-examination of Williams violated his rights under the Confrontation Clause; (3) whether the district court erred in not compelling the physician at the jail to examine Peyton's ears and testify as an expert; (4) whether cumulative errors at trial denied Peyton due process of law; (5) whether the district court erred in its jury instruction on reasonable doubt; (6) whether the district court erred in its jury instruction on possession of a firearm; (7) whether the federal carjacking statute is a proper exercise of Congress's power under the Commerce Clause; (8) whether Peyton's prior state escape and aggravated robbery convictions constitute violent felonies for purposes of an armed career criminal determination under 18 U.S.C. § 924(e); and (9) whether the district court erred in denying Peyton a judgment of acquittal or a new trial on grounds that the jury's verdict was against the manifest weight of the evidence.

### III. Analysis

### A. Motion to Suppress

First, Peyton claims that the district court erred in denying his motion to suppress the .38 revolver seized pursuant to his arrest. Specifically, he argues that the district court erred in concluding that his arrest was constitutional on grounds not argued–and thus waived–by the government. In opposing the motion below, Peyton argues, the government justified the arrest solely on the existence of an outstanding warrant for an unrelated robbery. Concluding that no warrant existed, the district court nonetheless denied the motion on the ground that the police had probable cause to arrest.

In reviewing a denial of a motion to suppress, this Court reviews the district court's findings

of fact for clear error and conclusions of law de novo. *United States v. Hurst*, 228 F.3d 751, 756 (6th Cir. 2000).

Contrary to Peyton's assertions, the government did in fact argue probable cause in the alternative:

> [Y]ou heard from two police officers who had personal knowledge that *probable cause existed for the arrest of Eric Peyton . . . in connection with the robbery and shooting of Jermaine Thomas*. . . . [B]oth because there was a valid warrant . . . and *because these police officers had probable cause to arrest*, the United States urges the Court to deny the motion to suppress . . . .

(Emphases added.) Therefore, there is no merit to the claim that the district court denied the motion on grounds not argued by the government.

## B. Confrontation Clause

Second, Peyton contends that the district court's decision to limit his cross-examination of Williams was a denial of his Sixth Amendment right to confront witnesses. At trial, defense counsel began to ask Williams whether any of her other boyfriends were members of a street gang known as the Black Gangsters Disciples in an attempt to establish that the gun found at Williams' mother's house belonged to someone other than Peyton. The government objected, stating it was inadmissible character evidence, impermissible impeachment evidence, and, in any event, more prejudicial than probative. The district court sustained the objection on the ground that the testimony would be inadmissible character evidence, but noted that the result would be different if counsel could lay a foundation that the use of guns is a tenet of the Black Gangsters Disciples. Peyton never attempted to lay such a foundation.

A district court's decision to limit cross-examination of a witness is reviewed for abuse of discretion. *United States v. Kone*, 307 F.3d 430, 436 (6th Cir. 2002).

-6-

The right of confrontation is not absolute. *Mason v. Mitchell*, 320 F.3d 604, 633 (6th Cir. 2003). "[T]he Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Id.* (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). In that regard, the Constitution generally does not guarantee a defendant an opportunity to admit evidence not properly admissible under the rules of evidence. *Cf. Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986) ("[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.").

The testimony regarding Williams' alleged ties to gang members was properly disallowed for two reasons. First, we find nothing in the record indicating a good faith basis for counsel's questioning. *See United States v. Katsougrakis*, 715 F.2d 769, 779 (2d Cir. 1983) ("Although counsel may explore certain areas of inquiry in a criminal trial without full knowledge of the answer to anticipated questions, he must, when confronted with a demand for an offer of proof, provide some good faith basis for questioning that alleges adverse facts."). Thus, the district court was right to disallow it.

Second, as the district court stated at trial, this type of evidence is relevant only where a proper foundation has been laid. Parties may not use a bare assertion of gang association to imply criminal activity. *Cf. United States v. Irvin*, 87 F.3d 860, 865 (7th Cir. 1996) ("Gangs generally arouse negative connotations and often invoke images of criminal activity and deviant behavior. There is therefore always the possibility that a jury will attach a propensity for committing crimes

to defendants who are affiliated with gangs or that a jury's negative feelings toward gangs will influence its verdict. Guilt by association is a concern whenever gang evidence is admitted."). Instead, parties generally must show that the gang engages in the specific activity at issue as a matter of course or principle. *Cf. United States v. Garcia*, 151 F.3d 1243, 1245-47 (9th Cir. 1998) (holding that proof of gang membership, without more, may not form the basis of a conspiracy conviction); *United States v. Robinson*, 978 F.2d 1554, 1561-63 (10th Cir. 1992) (upholding admission of evidence of gang membership as proof of knowledge and intent to sell cocaine where testimony established that selling cocaine was the "main purpose" of the gang). Here, for example, if Peyton wanted to introduce evidence of Williams' alleged ties to the Black Gangsters Disciples to show that the gun found at her house actually belonged to a member of that gang, Peyton would have needed to establish that gun ownership is a tenet of the Black Gangsters Disciples. Peyton made no attempt to lay such a foundation. Thus, the district court did not err in limiting the cross-examination.

In any event, the decision to allow the evidence was within the sound discretion of the trial court. We find nothing in the record demonstrating an abuse of that discretion, and therefore reject this challenge.

### C. Peyton's Access to an Expert

Third, Peyton claims that the district court erred in not compelling the physician at the jail to examine Peyton's ears and testify as an expert on his behalf. Although the district court actually granted Peyton's motion for examination by *a* physician, Peyton contends that the court erred in not ordering the physician *at the jail* to be his expert.

This Court reviews issues of law de novo and reviews a district court's denial of funds for an expert under the Criminal Justice Act for abuse of discretion. *United States v. Osoba*, 213 F.3d

913, 915 (6th Cir. 2000).

Peyton cites no authority to support his claim. In fact, independent research has failed to uncover a single case in which a court held it even *permissible* for a district court to order a particular physician to become an expert witness for a criminal defendant. This of course says nothing of Peyton's argument that the district court was *required* to do so.

The district court granted Peyton an opportunity to hire an independent physician to examine his ears. Peyton failed to do so and instead relied on a professional body piercing expert (whom the district court found to be a credible witness in all material respects). The district court did not abuse its discretion in handling this issue.

### D. Cumulative Error

Fourth, Peyton claims that cumulative errors at trial denied him due process of law. Errors that appear harmless in isolation may cumulatively amount to a denial of due process. *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir. 1983). Peyton alleges four errors. Each will be discussed in turn.

### 1. Officers' testimony recounting conversations with Williams

The first claimed error is the admission of statements by Lieutenant Connelley and Special Agent Jean-Marc Behar regarding their prior conversations with Tamika Williams. Peyton argues that both statements were inadmissible hearsay and improper bolstering.

"Hearsay" is a statement offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). "'[B]olstering occurs when the prosecutor implies that the witness's testimony is corroborated by evidence known to the government but not known to the jury.'" *United States v. Trujillo*, 376 F.3d 593, 608 (6th Cir. 2004) (quoting *United States v. Martinez*, 253 F.3d 251, 254 (6th Cir. 2001)).

Lieutenant Connelley's testimony was properly admitted. Lieutenant Connelley testified that Williams told him that Peyton had hidden a gun inside her mother's house and further testified that Williams then led him to the hiding place. This was not hearsay, because the government did not introduce it to prove that Peyton kept a gun at Williams' mother's house. Instead, the government used this testimony to show why police went inside William's mother's house after Peyton's arrest. The district court gave the jury a limiting instruction to that effect.

It is unclear how Lieutenant Connelley's testimony that Williams told him that Peyton kept a gun in her mother's house could be impermissible bolstering. The government did not need corroboration of the existence of the gun in the house, as the gun's presence in the house was never in issue. In short, the bolstering claim is meritless.

Agent Behar testified that he did not suggest to Williams how many piercings Peyton had. This testimony was not hearsay, because it did not involve a "statement." Non-verbal conduct constitutes a "statement" for hearsay purposes only if the person intends it as an assertion. Fed. R. Evid. 801(a). Agent Behar did not intend his silence as to Peyton's piercings as an assertion. The testimony, then, was not hearsay.

Peyton's bolstering claim is similarly unavailing. Simply put, Agent Behar's testimony did not involve an implied assurance that evidence not in the record corroborated Williams' testimony.

Therefore, the challenged testimony was not erroneously admitted.[2]

**2. Testimony that Peyton was a "violent fugitive" at the time of his arrest**

The second claimed error is the admission of testimony relating to Peyton's criminal status.

---

[2]Peyton also seems to suggest that the testimony was impermissible vouching. Such a claim is not cognizable here, because vouching involves statements made by the *prosecutor* that imply the government's belief in the credibility of a witness. *See Trujillo*, 376 F.3d at 607-08.

-10-

Lieutenant Connelley testified that, after concluding that Peyton was the man who robbed and shot Jermaine Thomas, he had decided to arrest Peyton because he "believed that [Peyton] was a violent fugitive at large and that he may become involved in another shooting." Peyton claims that this testimony was irrelevant and prejudiced the jury in that it revealed details of an arrest for an unrelated crime.

As an initial matter, the testimony was relevant to show why the police surveilled Williams' house to arrest Peyton. Furthermore, it was not unfairly prejudicial. *See* Fed. R. Evid. 403. Testimony regarding a defendant's unrelated crimes may constitute prejudicial error. *See, e.g.*, *United States v. Nemeth*, 430 F.2d 704, 705-06 (6th Cir. 1970) (per curiam). Here, however, Lieutenant Connelley did not testify to any other alleged criminal activity. He stated only that he sought to arrest Peyton because he believed Peyton to be a "violent fugitive . . . [who] may become involved in another shooting." Although Peyton was wanted for an unrelated robbery at the time, Lieutenant Connelley never mentioned that fact at trial. Nor was the other robbery entered into the record elsewhere. The jury would have had no reason to impute an unrelated crime to Lieutenant Connelley's statement that Peyton was a "violent fugitive." The only reasonable inference a juror could have drawn was that Lieutenant Connelley was referring to the shooting and robbery at the Sunoco gas station. Therefore, the testimony was not unfairly prejudicial.

### 3. *Doyle v. Ohio*

The third claimed error is that the government impeached Peyton's exculpatory story through the use of his post-arrest silence, in violation of his due process rights as explained in *Doyle v. Ohio*, 426 U.S. 610 (1976). The primary defense theory was that Peyton could not have been the gunman since the video clearly shows the gunman as having both ears pierced, and Peyton has only ever had

one pierced. In an attempt to establish this defense, defense counsel repeatedly asked Lieutenant Connelley why the police did not physically examine Peyton's ears after his arrest. On rebuttal, the government asked Lieutenant Connelley why he did not ask Williams about Peyton's piercings. Lieutenant Connelley responded:

> Well, for several reasons; Number 1 is because when I reviewed the videotape, I had recognized Eric Peyton as the male in the tape, and I had showed a lineup to the victim, and he had identified Eric Peyton as the man in the videotape. . . . I didn't feel like we needed to take any examinations of his ears as the detective pulled earrings out of his ears and we had the two earrings placed into evidence. So for those reasons, I didn't feel it was necessary, and the fact that the Defendant was going to dispute the fact that he had either one or two earrings.

Peyton argues that this testimony impermissibly used Peyton's post-arrest silence against him.

*Doyle* held that due process does not permit a criminal defendant to be penalized for exercising his constitutional right to remain silent. *Doyle*, 426 U.S. at 618; *see also Wainwright v. Greenfield*, 474 U.S. 284, 295 (1986) ("*Doyle* . . . held that *Miranda* warnings contain an implied promise, rooted in the Constitution, that silence will carry no penalty." (internal quotation omitted)). In *Doyle*, the government used the defendants' post-arrest silence to impeach their testimony, essentially implying that truly innocent suspects would have disclosed their exculpatory stories to police at the time of their arrests. *Doyle*, 426 U.S. at 613-14. In *Wainwright*, the government used the defendant's post-arrest silence to refute his insanity defense–that is, the defendant could not have been legally insane while at the same time capable of appreciating and invoking his right to silence. *Wainwright*, 474 U.S. at 287. In both cases, the Supreme Court concluded that the government had effectively penalized the defendants for invoking their constitutional rights that implicitly guaranteed that their silence would not be used against them. *Id.* at 295.

Peyton's case is entirely different. As the Supreme Court and this Court have made clear,

*Doyle* applies only in the context of post-*Miranda* silence. *See Fletcher v. Weir*, 455 U.S. 603, 607 (1982) (holding that *Doyle* does not apply to the use of post-arrest, pre-*Miranda* silence); *Jenkins v. Anderson*, 447 U.S. 231, 238-39 (1980) (holding that *Doyle* does not apply to the use of pre-arrest, pre-*Miranda* silence); *Combs v. Coyle*, 205 F.3d 269, 280 (6th Cir. 2000) (noting that, under *Doyle*, receipt of the *Miranda* warnings is key). Here, however, there is no evidence nor allegation that Peyton had actually received his *Miranda* warnings at the time of his alleged silence. Thus, *Doyle* is entirely inapplicable.

Even assuming the *Miranda* warnings had been given, no *Doyle* error occurred, because the testimony at issue did not refer to Peyton's post-arrest "silence." "A prosecutor's or witness's remarks constitute comment on a defendant's silence if the manifest intent was to comment on the defendant's silence, or if the character of the remark was such that the jury would naturally and necessarily so construe the remark." *United States v. Rivera*, 295 F.3d 461, 469 (5th Cir. 2002) (internal quotation omitted). The testimony at issue here does not satisfy this definition. Lieutenant Connelley did not refer, either explicitly or implicitly, to Peyton's silence. He merely testified that at the time of arrest and booking, he did not have reason to believe Peyton would defend himself on a theory that he had only one ear pierced. This could not reasonably have been interpreted to mean that Peyton remained silent following his arrest.

### 4. Identification instruction

The final claimed error is that the district court did not give an instruction concerning identification testimony. The so-called *Telfaire* instruction, approved by this Court in *United States v. O'Neal*, 496 F.2d 368 (6th Cir. 1974), and *United States v. Scott*, 578 F.2d 1186 (6th Cir. 1978), explains that "you, the jury, must be satisfied beyond a reasonable doubt of the accuracy of the

identification of the defendant before you may convict him," *United States v. Telfaire*, 469 F.2d 552

app. at 558 (D.C. Cir. 1972). It also advises the jury to consider

> (1) the capacity and opportunity of the witness to observe reliably the offender; (2) the question whether the identification was the product of a witness' own recollection, in view of the strength of the identification and the circumstances under which it was made; (3) the inconsistent identifications made by the same witness; and (4) the credibility of the witness.

*Scott*, 578 F.2d at 1191 (citing *Telfaire*, 469 F.2d at 558-59). Peyton did not request a *Telfaire* instruction at trial; thus, the issue is reviewed for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. McGee*, 173 F.3d 952, 957 (6th Cir. 1999).

This Court has held that an identification instruction is required only "when the issue of identity is crucial, *i. e.* [sic], either where no corroboration of the testimony exists, or where the witness' memory has faded by the time of trial, or where there was a limited opportunity for observation." *Scott*, 578 F.2d at 1191; *see also United States v. Boyd*, 620 F.2d 129, 131-32 (6th Cir. 1980) (noting that the instructions "need be given only where there is a danger of misidentification due to lack of corroborative evidence"). This is simply not one of those cases. Jermaine Thomas viewed Peyton in bright lighting inside the gas station and again in relatively good lighting outside. Thomas later identified Peyton as the gunman in two different six-person photo arrays. There is no allegation of a faded memory. The government also produced substantial corroboration of Thomas' identification. The ballistics expert identified the bullet from Thomas' pants as having been fired from the gun seized from Peyton at the time of his arrest. Tamika Williams positively identified Peyton as the gunman from the surveillance video and further testified that later Peyton had admitted the robbery and shooting. Therefore, the district court committed no error, plain or otherwise, in not giving an identification instruction.

## 5. No cumulative error

Because none of these claims was even error, cumulatively they do not require reversal.  *See Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004) ("[T]he accumulation of non-errors cannot collectively amount to a violation of due process." (internal quotation omitted)).

## E.  Reasonable Doubt Instruction

Fifth, Peyton challenges the district court's jury instruction on reasonable doubt.  Because Peyton did not object to the instruction in the district court, this issue is also reviewed for plain error.

This claim borders on the frivolous.  The instruction given was nearly a verbatim recitation of the Sixth Circuit's Pattern Jury Instructions,[3] which this Court has expressly approved.  *United States v. Goodlett*, 3 F.3d 976, 979 (6th Cir. 1993) (citing Sixth Circuit Pattern Jury Instruction 1.03).  Thus, the district court did not plainly err in giving this instruction.

## F.  Possession of a Firearm Instruction

Sixth, Peyton challenges the district court's jury instruction on possession of a firearm.  Again, this issue is reviewed for plain error, as Peyton did not object to the instruction below.

Peyton contends that the following instruction effectively made the crime one of strict liability and also constituted an unconstitutional bill of attainder:

> To establish [possession of a firearm], it is not necessary for the Government to prove the Defendant knew that the firearm previously traveled in interstate commerce, nor is the Government required to prove that at the time the defendant possessed the firearm, he knew that he was breaking the law.  It is sufficient if you find beyond a reasonable doubt that he possessed in commerce what he knew to be a firearm after he had been convicted of a felony offense.

---

[3]The pattern "reasonable doubt" instruction is available at http://www.ca6.uscourts.gov/internet/crim_jury_insts/html/chap1_8.htm (last visited May 17, 2006).

-15-

However, this Court has already considered and summarily rejected these same arguments as to an identical jury instruction. *See United States v. Davis*, 27 F. App'x 592, 599-600 (6th Cir. Dec. 27, 2001) (unpublished decision). Having no reason to reconsider this reasoned decision, we conclude that the instruction was not erroneous.

## G. Commerce Clause Challenge to 18 U.S.C. § 924(c)(1)(A)

Seventh, Peyton argues that the federal carjacking statute, 18 U.S.C. § 924(c)(1)(A), is an unconstitutional use of Congress' power to enact legislation under the Commerce Clause, in light of *United States v. Lopez*, 514 U.S. 549 (1995). Although this issue is likely waived because Peyton did not raise it below, *see United States v. Chesney*, 86 F.3d 564, 567 (6th Cir. 1996), it fails nonetheless. Federal courts, including this one, have unanimously rejected this constitutional challenge to the carjacking statute. *See United States v. McHenry*, 97 F.3d 125, 129 (6th Cir. 1996) (holding the carjacking statute constitutional post-*Lopez*); *see also United States v. Rivera-Figueroa*, 149 F.3d 1, 3-4 (1st Cir. 1998) (joining "the unanimous opinion of the other circuits" that even after *Lopez* the carjacking statute is constitutional).

## H. Escape and Aggravated Robbery as "Crimes of Violence"

Eighth, Peyton challenges the district court's determination that his prior state convictions for escape and aggravated robbery are "crimes of violence" for purposes of the Armed Career Criminal Act ("ACCA"). *See* 18 U.S.C. § 924(e)(1); U.S. Sentencing Guidelines Manual § 4B1.2 (2004). Peyton did not object to the district court's crime of violence determination as to his aggravated robbery conviction. Thus, Peyton has forfeited his right to raise the issue on appeal. *See United States v. Dobish*, 102 F.3d 760, 762 (6th Cir. 1996) (per curiam). He did, however, properly preserve a challenge to the characterization of his escape conviction as a crime of violence.

A district court's determination of whether a particular offense is a crime of violence is reviewed de novo. *See United States v. Galloway*, 439 F.3d 320, 322 (6th Cir. 2006).

The Supreme Court has stated that "crime of violence" determinations must be made using the categorical approach. *See Taylor v. United States*, 495 U.S. 575, 600 (1990). The categorical approach first requires reference to the fact of conviction and the statutory definition of the offense, but not to the underlying facts. *United States v. Martin*, 378 F.3d 578, 581 (6th Cir. 2004). Peyton stipulated to the fact of his escape conviction. Thus, the only remaining issue is whether the crime of escape is properly characterized as a crime of violence.

If the statutory definition of the offense alone is not determinative, a court may consider "the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." *Shepard v. United States*, 544 U.S. 13, 15 (2005). This is most often used "where the prior offense is defined broadly enough for it to encompass some offenses that meet the ACCA's definition of a 'violent felony' and some that do not." *United States v. Hargrove*, 416 F.3d 486, 494 (6th Cir. 2005).

In Ohio, the crime of escape is defined broadly enough to encompass both violent and non-violent conduct. *See* Ohio Rev. Code Ann. § 2921.34(A)(1) ("No person . . . shall purposely break or attempt to break the detention, or purposely fail to return to detention . . ."). Under *Shepard*, then, we must look to other sources to make the "crime of violence" determination. *See Hargrove*, 416 F.3d at 494. Peyton's state court indictment is dispositive of our inquiry. In charging Peyton with the crime of escape, the state of Ohio left out the possibility that Peyton's conduct was non-violent, charging only that Peyton, "knowing he was under detention or being reckless in that regard, did purposely break or attempt to break such detention." The indictment did not include the possibility

-17-

that Peyton merely failed to return to detention. Therefore, Peyton's escape conviction satisfies the statutory definition of a crime of violence.

## I. Motion for Judgment of Acquittal or a New Trial

Finally, Peyton claims that the district court erred in denying his motion for judgment of acquittal or, alternatively, a new trial. Peyton had argued that the jury's verdict on all counts was against the manifest weight of the evidence. Specifically, Peyton argues that the identification evidence was insufficient as to Counts 1, 2, and 3, and that the possession evidence was insufficient as to Count 4. The denial of these motions is reviewed for abuse of discretion. *United States v. Blood*, 435 F.3d 612, 622 n.4 (6th Cir. 2006) (motion for judgment of acquittal); *United States v. Frost*, 125 F.3d 346, 382 (6th Cir. 1997) (motion for new trial).

The first issue is the sufficiency of the identification evidence used to convict Peyton on Counts 1, 2, and 3. Peyton again relies solely on the fact that the surveillance video shows the gunman had both ears pierced. As detailed *supra*, however, the identification evidence against Peyton was overwhelming. The government presented two witnesses (Detective Habeeb and Williams) who testified that Peyton had piercings in both ears. The images from the video itself show Peyton to be the gunman; Williams confirmed the identification in her testimony. She further testified that Peyton told her on the night of the robbery that he had commited a robbery and carjacking at a gas station East 116th Street and Union Avenue. Jermaine Thomas identified Peyton as the gunman in two separate photo arrays and at trial. Finally, a ballistics expert matched the bullet found in Thomas' pants to the gun found on Peyton's person during his arrest. In light of this evidence and the highly deferential abuse of discretion standard, the testimony of a body piercing expert that Peyton's right ear had never been pierced simply is not enough for us to conclude that

-18-

the jury's verdict was against the manifest weight of the evidence. Thus, the district court did not err in denying the motions as to Counts 1 and 2.[4]

The other issue is the sufficiency of the evidence that Peyton possessed the sawed-off shotgun found in Williams' mother's house. Williams testified that Peyton had hidden the gun in the house. The jury obviously found her testimony credible and returned an appropriate verdict. Peyton does not point to any contradictory evidence in the record; he argues only that Williams' testimony was insufficient to establish possession. Since appellate courts do not re-weigh the evidence or judge the credibility of witnesses, and draw all inferences in favor of the finder of fact, *United States v. Beverly*, 369 F.3d 516, 532-33 (6th Cir. 2004), we conclude that the district court did not abuse its discretion in denying the motions as to Count 4.

## IV. Conclusion

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

---

[4]Count 3 had no factual relationship to the identification of the gunman from the surveillance video, since that count charged only that Peyton was in possession of a firearm when arrested. This is clear in the indictment, as the date of the criminal conduct is said to have been May 7, 2004, the date of Peyton's arrest. Therefore, the identification argument is inapplicable to that count.